John MOELLER, Alan Bilstad, Alvin Sorensen, dba Lehigh Grain Company; Lehigh Sewer Pipe And Tile Company, Inc.; Lehigh Lumber Company, Inc.; The Incorporated Town of Lehigh, Iowa; and The Iowa State Commerce Commission, Plaintiffs,

v.

INTERSTATE COMMERCE COMMISSION and The United States of America, Defendants,

Fort Dodge, Des Moines & Southern Railway Company, Intervenor-Defendant.

Civ. No. 4–1166.

United States District Court
S. D. Iowa,
Central Division.

Feb. 2, 1962.

Robert R. Rydell, Des Moines, Iowa, for all plaintiffs.

R. Y. Taylor, Guthrie Center, Iowa, for all plaintiffs, except Iowa State Commerce Commission.

Donald A. Wine, U. S. Dist. Atty., Davenport, Iowa, and Betty Jo Christian, Atty., Interstate Commerce Commission, Washington, D. C., for defendants.

John C. Eddy, Des Moines, Iowa, for intervenor.

Before VAN OOSTERHOUT, Circuit Judge, and STEPHENSON and GRAVEN, District Judges.

GRAVEN, Senior District Judge.

This is an action brought under the provisions of 49 U.S.C.A. § 17(9) and 28 U.S.C. § 2323 to review an order of the Interstate Commerce Commission issued March 30, 1961, authorizing the Fort Dodge, Des Moines & Southern Railway Company to abandon a small branch line.

On March 28, 1960, the Fort Dodge, Des Moines & Southern Railway Company filed with the Interstate Commerce Commission an application to abandon that portion of its railroad line in Webster County, Iowa, which extended from Evanston Junction to Lehigh, Iowa. That application was set for hearing before an examiner at Fort Dodge, Iowa. At that hearing all the plaintiffs appeared as protestants. A number of railway labor organizations also appeared as protestants. At the opening of the hearing the applicant stated that it would accept, in any certificate granted, conditions for the protection of railway employees similar to those imposed in Chicago, B. & Q. R. Co. Abandonment, 257 I.C.C. 700. Thereafter the representatives of the railway labor organizations did not actively participate in the hearing. A hearing of some length was held. A number of the officers of the applicant testified at length at the hearing, including its auditor. In its application the Railway Company attached statements as to its operations for 1957, 1958 and the first six months of 1959. Included in those statements were its figures relating to the operation of the branch line proposed to be abandoned for the same periods. At the hearing there was an extended examination of the Railway Company officials as to those figures.

On October 20, 1960, the examiner made his report. In it he recommended that the request for the abandonment of the branch line be authorized. The protestants filed exceptions to that report. Following the filing of those exceptions, the entire matter was considered by Division 3 of the Commission. On March 30, 1961, that Division issued its report and order. It held that the proposed abandonment was justified by public convenience and necessity and ordered the issuance of an appropriate certificate. The protestants then petitioned the entire Commission for reconsideration, rehearing and oral argument. The Commission denied that petition on July 5, 1961, and fixed August 9, 1961, as the effective date of its order. The present action was commenced on August 4, 1961. The effective date of the order of abandonment was postponed by a restraining order issued by this Court. That restraining order was subsequently dissolved when the Commission postponed the effective date of the order pending final outcome of this action. The Fort Dodge, Des Moines & Southern Railway Company subsequently, by leave of Court, intervened in this action. It will be hereinafter referred to as the Intervenor Railway.

The authority of the Interstate Commerce Commission to authorize the abandonment of a line of railroad is found in Sections 1(18), (19), (20), and (22) of Title 49 United States Code Annotated. The present action involves Section 1(18) which provides, in part, as follows:

"No carrier by railroad subject to this chapter shall * * * abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

That Section was enacted as a part of the Transportation Act of 1920. 41 Stat. 477. An excellent discussion of railroad abandonments under that Act is contained in Weissman, Railroad Abandonments: The Impact of Competition, 44 Iowa Law Review 492 (1959). From 1920 to the end of 1943, the Commission authorized abandonment of 29,012 miles of track in 1,971 cases. See Weissman, supra, page 496, footnote 20.

■ The scope of the review by this Court is well settled. The case of United States v. Pierce Auto Freight Lines, Inc. (1946), 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821, involved an appeal from the decision of a three-judge court (D.C., 57 F.Supp. 192) which suspended an order of the Interstate Commerce Commission. In reversing the action of the lower court, the United States Supreme Court stated (327 U.S. at pp. 535–536, 66 S.Ct. at p. 698):

"We think the court misconceived not only the effects of the Commission's action in these cases but also its own function. It is not true, as the opinion stated, that ' * * * the courts must in a litigated case, be the arbiters of the paramount public interest.' This is rather the business of the Commission, made such by the very terms of the statute. The function of the reviewing court is much more restricted. It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done * * * for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law."

The standard of review just referred to has been held to be applicable in cases involving review of a Commission order authorizing the abandonment of a line of railroad. Village of Candor v. United States (D.C.1957), 151 F.Supp. 889, 892; State of North Carolina v. United States (D.C.1954), 124 F.Supp. 529, 532.

The scope and basis of the authority committed to the Interstate Commerce Commission in connection with abandonment proceedings is stated in the case of State of Colorado v. United States (1926), 271 U.S. 153, 46 S.Ct. 452, 70 L. Ed. 878 (271 U.S. at pp. 167–168, 46 S. Ct. at pp. 455, 456):

"While the constitutional basis of authority to issue the certificate of abandonment is the power of Congress to regulate interstate commerce, the Act does not make issuance of the certificate conditional upon a finding that continued operation will result in discrimination against interstate commerce, or that it will result in a denial of just compensation for the use in intrastate commerce of the property of the carrier within the State, or that it will result in a denial of such compensation for the property within the State used in commerce intrastate and interstate. The sole test prescribed is that abandonment be consistent with public necessity and convenience."

■ The Intervenor Railway owns and operates a railroad line located in central Iowa which, including the portion of the line proposed to be abandoned, is 145 miles in length. As of September 30, 1959, its total assets were of the value of $4,612,784.40 and it had debt liabilities in the amount of $2,650,496.49. Its net income for the years of 1957 and 1958 was $31,664.00 and $22,284.00 respectively. The main termini of the Intervenor's line are Fort Dodge and Des Moines. Its headquarters is at Boone. One portion of its line runs east from Fort Dodge to Webster City. One of the points on that line is Evanston Junction. The portion of line proposed to be abandoned is a branch line which commences at Evanston Junction and pro-

ceeds in a southerly direction to the town of Lehigh. The line is 5.5 miles in length. There are 2.78 miles of sidetrack used in connection with the line. The town of Lehigh is the only point served by the line. The line was constructed in 1917 to provide passenger service to the town of Lehigh and to provide freight service to the industries located at or near Lehigh. At one time there were a number of coal mines in operation in the vicinity of Lehigh. They have been closed down for a number of years. For a number of years the plaintiff, Lehigh Sewer Pipe and Tile Company, Inc., has operated a large clay manufacturing plant located a mile and a half west of Lehigh. It is on a sidetrack of the branch line. The Intervenor Railway continued passenger service on the line until 1927 when it was permanently discontinued. In 1959 the Intervenor Railway discontinued the handling of less than carload shipments on the line. Since 1957 no regularly scheduled freight runs have been maintained. Freight trains run on the line according to traffic needs, usually three or four times a week.

Lehigh has a population of 880. The Intervenor's branch line is the only railroad serving it. The town of Dayton is 8.5 miles to the south of Lehigh. Dayton is on a line of the Chicago & Northwestern Railway Company. A line of the Intervenor extends south from Fort Dodge through the town of Lundgren. Lundgren is six miles to the west of Lehigh and is connected to it by a paved highway. The town of Duncombe is eleven miles to the north of Lehigh. The towns of Dayton and Duncombe are connected to Lehigh by asphalt coated highways. Railroad freight agency service is maintained at Lundgren, Dayton and Duncombe. Lundgren, Dayton and Duncombe are situated on paved arterial highways.

The roadbed and structures on the line are in reasonably good condition. The Des Moines River flows through Lehigh. The line crosses that river and a number of its tributaries. Because of that situation, there are sixteen bridges on the line. In the past the line has been subjected to serious flood damage. In 1944 and 1954 major floods washed out a number of bridges and portions of the roadbed. To adequately protect the line from damage by major floods would require very large expenditures. The junk value of the line in the event of abandonment is estimated to be $48,000.00. A station agent services the Intervenor's freight business at Lehigh on a parttime basis. The Intervenor has no station building at Lehigh, and the parttime station agent transacts agency business at the office of the plaintiff, Lehigh Grain Company.

Over the years there has been a steady and substantial decline in the freight traffic on the line. The number of cars moved on the line in 1956 was 1,277. By 1959 the number of cars moved on the line had declined to 375. During recent years, for all practical purposes, only three firms have made use of the freight service provided on the line. They are the plaintiffs, Lehigh Sewer Pipe and Tile Company, Inc., Lehigh Grain Company, and Lehigh Lumber Company, Inc. The plaintiff, Lehigh Sewer Pipe and Tile Company, Inc., is engaged in the manufacture of drain tile, sewer pipe and other clay products. It is a firm of considerable size with from 250 to 300 employees. The plaintiff, Lehigh Grain Company, is engaged in the purchase, sale and storage of grain. The plaintiff, Lehigh Lumber Company, Inc., is engaged in the retail lumber business. The area in the vicinity of Lehigh is primarily agricultural in character. The largest user of the branch line is the Lehigh Sewer Pipe and Tile Company, Inc.

In 1956 the Intervenor Railway transported 1,243 carload shipments for the plaintiff, Lehigh Sewer Pipe and Tile Company, Inc., of which 142 were inbound shipments and 1,101 were outbound shipments. In 1959 that plaintiff's total rail shipments amounted to 285 carloads consisting of 195 outbound shipments and 90 inbound shipments. During the first six months of 1960 its

shipments were at about the same rate as in 1959. In 1959 it made a large addition to its plant and it plans to still further increase the capacity of its plant. Its outbound shipments consisted of clay products manufactured by it. A substantial part of its inbound shipments consist of fuel oil and coal. According to the experience of the Association of American Railroads, shipments of clay products have a high ratio of damage claims. Around 82 per cent of the manufactured products of the Lehigh Sewer Pipe and Tile Company, Inc., are transported by motor carriers. The reason for that high percentage is that contractors who purchase the tile manufactured by it prefer to have it delivered directly to the job site. In 1956 the Intervenor Railway, motivated by the desire to increase the use of its line by the Lehigh Sewer Pipe and Tile Company, Inc., purchased 67 cars especially adapted to the transportation of clay products at a cost in excess of $100,000.00. Many of those cars stand unused on sidings.

The plaintiff, Lehigh Grain Company, is the second biggest user of the freight service provided. Since 1956 it has added to its facilities for the handling and storing of grain. That shipper shipped 17 carloads of grain in 1956. By 1959 its shipments of grain had increased to 72 carloads. During the first six months of 1960 it shipped 33 carloads of grain.

The plaintiff, Lehigh Lumber Company, Inc., receives about 18 carloads a year from the line. The shipments consist of lumber, cement, and posts. That company has another lumber yard at Dayton, which, as heretofore noted, is located 8.5 miles south of Lehigh on another railroad.

It is the contention of all the plaintiffs that the finding of the Commission that public convenience and necessity justifies the abandonment of the line is not supported by substantial evidence. The plaintiff, Lehigh Sewer Pipe and Tile Company, Inc., also asserts that, because of a contract obligation existing between it and the Intervenor Railway, the latter may not abandon the line. The conten-

tion of the plaintiffs that the finding of the Commission is not supported by substantial evidence is largely centered around their claim that the data as to the revenue from the line and the cost of providing service on the line is lacking in reliability. It is their claim that because of that alleged feature the evidence does not support the finding of the Commission that the continued operation of that line would be a burden upon interstate commerce and not justified by public convenience and necessity. They also stress the hardship that would be occasioned to the three shipper plaintiffs by the abandonment of the line.

The Intervenor Railway contends that the operation of the line is now, and for some time has been, a financial drain upon the entire system and endangers its entire financial structure. It submitted figures which purported to show the financial results of operating the line during 1958, 1959, and the first three months of 1960. Those figures purported to show a $36,172.00 loss for 1957; a $42,679.00 loss for 1958; a $39,713.00 loss for 1959; and an $8,307.00 loss for the first three months of 1960. The examiner found that the financial data submitted by the Intervenor Railway was not in all respects reliable. He stated that the Intervenor Railway in its financial data as to losses had not given consideration to the "feeder value" of the line. A standard formula is applied by the Commission in determining the "feeder value" of a line. The part of the freight revenue assigned direct to the line on a mileage pro rate basis is subtracted from the total freight service which moved on the line. Fifty per cent of the remainder is considered the "feeder value" of the line on the theory that the cost of moving that traffic over other lines would constitute fifty per cent of the service. The examiner stated that if the "feeder value" formula were employed the loss on the line would be $18,581.00 for 1957; $31,844.00 for 1958; and $29,535.00 for 1959. The examiner found that there was a certain amount of duplication in certain items of

expense and that there were certain errors in the allocation of expense. As to a number of items, neither the examiner nor the Commission was able to ascertain the exact amount that should be allocated to the branch and they made an estimate of the amounts by which the figures of the Intervenor Railway should be reduced. The examiner in that connection stated as follows:

"As a whole, however, the record is convincing that the operation of the line is being conducted at a substantial loss and there is no evidence of any new or additional traffic for the line which would result in future profits. In the circumstances, the continued operation of the line would impose an undue burden upon the applicant and upon interstate commerce."

The Commission in its order, after referring to the downward adjustment of the Intervenor Railway's figures as to its purported losses for 1957, 1958, and 1959, goes on to state:

"Lack of express data necessary for such adjustments prevents us from making the computations; however, it is inconceivable that any further adjustments could reduce the figures more than $2,000 to $3,000, which would result in losses ranging from $15,000 to $27,000 for the named years."

 It is well settled that in a railway abandonment case the Commission need not determine with mathematical exactness the extent of the burden imposed upon interstate commerce by the operation of a branch line. Transit Commission of State of New York v. United States (1932), 284 U.S. 360, 370, 52 S. Ct. 157, 76 L.Ed. 342. Such a burden may involve various elements and, if the whole proof sustains the conclusion of the Commission that the continued operation would in fact unreasonably burden interstate commerce, such conclusion will stand. Transit Commission v. United States, supra. In regard to the matter of determining the allocation of rev-

enues and costs of operation of a branch line, the experience of the Commission is of importance. Because of its experience in that field, the findings of the Commission as to the proper allocation of revenues and expenses should not be overturned unless it can be shown that such allocations were arbitrary or otherwise clearly erroneous. The plaintiffs have not shown that the allocations of revenue and expenses made by the Commission in the present proceeding were arbitrary or otherwise clearly erroneous.

Where the Commission finds that the operation of a particular railroad line imposes a burden on other commerce, but it appears that its abandonment will work a hardship on those being served by the line, there is presented to the Commission a problem of balancing of interests. As stated by Mr. Justice Brandeis in the case of State of Colorado v. United States, supra (271 U.S. at p. 168, 46 S.Ct. at p. 456):

"The benefit to one of the abandonment must be weighed against the inconvenience and loss to which the other will thereby be subjected. Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce. * * * The result of this weighing—the judgment of the Commission—is expressed by its order granting or denying the certificate."

In the present case, the members of the local community whose interests would be most adversely affected would be the interests of the plaintiffs, Lehigh Sewer Pipe and Tile Company, Inc., Lehigh Lumber Company, Inc., and the Lehigh Grain Company. The Commission found there was no assurance that there would be increased use of the line by the plaintiff, Lehigh Sewer Pipe and Tile Company, Inc. In the report of the examiner it is stated:

"The record is clear that the pipe company needs applicant's service to bring in a relatively few shipments

of coal and oil especially during the winter months, which are used to fire its kilns. On outbound shipments, available motor-carrier services are adequate for its needs and much more convenient both to it and the consignee because only 1 movement is involved, whereas shipments by rail generally require an additional movement by truck."

The Commission found that the abandonment of the branch would necessitate that the Lehigh Lumber Company, Inc., receive its lumber shipments at a railway point six miles from Lehigh and that the transportation from that point would increase its expense for obtaining lumber.

■■ The shipper that would suffer most by the abandonment of the line is the Lehigh Grain Company. The transportation of grain to terminal markets requires the use of railroad cars. There are a number of firms in nearby towns which are engaged in the same business as the Lehigh Grain Company and competition is very keen. Grain is handled on a very narrow margin and the additional cost to the Lehigh Grain Company of trucking grain to other railway points would place it in a very serious situation. The Commission noted the transportation problem that would confront the Lehigh Grain Company if the line were abandoned. It is well settled, however, that a shipper cannot insist that a burdensome line be maintained solely for his own benefit. Village of Candor v. United States (D.C.1957), 151 F.Supp. 889, 893; Town of Inlet v. New York Cent. R. Co. (D.C.1934), 7 F.Supp. 781, 784; United States Feldspar Corporation v. United States (D.C.1930), 38 F.2d 91, 95. The fact that a line of railway is vital to the necessities of a local community is not determinative on the question of its abandonment. United States Feldspar Corporation v. United States, supra.

In the present proceeding the Commission found that the cost of continuing the operation would be burdensome. It then discussed the situation of those whose interests would be adversely affected by the abandonment. It is clear that the Commission did consider and weigh the conflicting interests. The Commission issued its certificate authorizing the abandonment which expressed its judgment on the matters involved. Congress has vested the Commission with the authority to determine those matters. The determination of the Commission, after a consideration of all the elements involved, that abandonment is justified by public convenience and necessity is subject only to the limited court review heretofore noted. The plaintiffs have not shown that such determination and the findings which inhere therein were induced by an erroneous view of the law, or were arbitrary or capricious, or not supported by substantial evidence.

■ The plaintiff, Lehigh Sewer Pipe and Tile Company, Inc., contends that the Intervenor Railway may not discontinue furnishing it with railway service because of an existing agreement. In 1954 there was a major flood which washed out a number of bridges and portions of the roadbed. The line was out of service for about three months. The Intervenor Railway was hard pressed financially and the matter of rehabilitating the line presented a serious financial problem. A substantial portion of the cost of rehabilitation would be the cost of rehabilitating that portion of the line between the Des Moines River and the Lehigh Sewer Pipe and Tile Company, Inc. The Intervenor Railway borrowed $15,000.00 from that company payable at the rate of $300.00 a month. Contemporaneous with the making of the loan, the Intervenor Railway signed an agreement which provided, in substance, that it would continue to maintain the line and furnish adequate service. The agreement has no termination date. At the time of the hearing on the application for abandonment, there was a balance due on the loan of around $3,000.00. During the hearing the Intervenor Railway tendered the Lehigh Sewer Pipe and Tile Company, Inc., the balance due on the loan. It seems clear that the existence of private agreement between a

carrier and shipper for continued service cannot prevent abandonment of a railway line if the facts so warrant. If private contracts could prevent the abandonment of a line where the facts so warrant, the power of Congress to regulate interstate commerce would be thereby thwarted. It is the holding of the Court that abandonment of the line is not prevented by the agreement in question.

IT IS HEREBY ORDERED that the order of the Commission authorizing the abandonment of the line in question be not set aside or vacated and that judgment be entered dismissing the plaintiffs' complaint with prejudice and rendering final judgment herein in favor of the defendants.

The foregoing memorandum opinion shall constitute the Court's findings of fact, conclusions of law and order for judgment as provided by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.