**WASHINGTON AND OLD DOMINION USERS ASSOCIATION, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

Civ. A. No. 4703–A.

United States District Court
E. D. Virginia,
Alexandria Division.

Argued May 14, 1968.

Decided July 25, 1968.

Gerald J. O'Rourke, Jr., Washington, D. C., E. A. Prichard, Fairfax, Va., for plaintiff.

Donald F. Turner, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., C. Vernon Spratley, Jr., U. S. Atty., Alexandria, Va., for United States.

Robert W. Ginnane, Gen. Counsel, Nahum Litt, Atty., I.C.C., Washington, D. C., for Interstate Commerce Commission.

Gerald J. O'Rourke, Jr., Glassie & Molloy, Washington, D. C., E. A. Prichard, Bauknight, Prichard, McCandlish & Williams, Fairfax, Va., for The Northern Virginia Transportation Commission, plaintiff-intervenor.

E. Milton Farley, III, James E. Farnham, Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., for Virginia Electric & Power Co., defendant-intervenor.

Edward D. Gasson, Fairfax, Va., for Virginia State Highway Dept., defendant-intervenor.

Benson T. Buck, John W. Hanifin, Lewis S. Minter, Richmond, Va., Hardee Chambliss, Centreville, Va., for Washington & Old Dominion RR., defendant-intervenor.

Before BUTZNER, Circuit Judge, and LEWIS and MERHIGE, District Judges.

BUTZNER, Circuit Judge:

The Washington & Old Dominion Users Association challenges an order of the Interstate Commerce Commission authorizing the Washington & Old Dominion Railroad to abandon its entire line.[1] The association summarized its objections as follows:[2]

"1. The Commission erred in relying upon an incomplete and inaccurate

---

1. Washington & Old Dominion Railroad —abandonment—ICC finance docket No. 23492 (January 23, 1968).

2. The Northern Virginia Transportation Commission intervened as a plaintiff. Its objections generally parallel those of

record in determining the profitability of the W & OD operations.

"2. The Commission erred in looking to a period of time almost wholly made up of years during which the application for abandonment was pending in reaching its conclusions as to the traffic volume and traffic revenue of the W & OD determinative of whether public convenience and necessity required the continued operation of the railroad.

"3. The Commission erred in refusing to make abandonment conditioned upon the W & OD first being offered for sale for continued operation."

█ The commission's report that the public convenience and necessity permit abandonment is warranted in law and supported by substantial evidence on the record viewed as a whole. Accordingly, we deny the relief the plaintiffs seek. See United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

W & OD, a Class II, short-line carrier, traces its history from 1847 when its predecessor, the Alexandria & Harpers Ferry Railroad Company, sought to make a rail connection from the Potomac River port at Alexandria, Virginia, to the Shenandoah Valley and the West Virginia coal fields. These ambitions were never achieved, and W & OD's operations are limited to about 48 miles of main line track and eight miles of side track entirely within Virginia from Alexandria through Arlington and Fairfax Counties to a dead end at Purcellville in Loudoun County. Passenger service was discontinued in 1951. Since then W & OD has carried only freight. It interchanges traffic in Alexandria and at the Potomac Yard with five railroads. In 1956, the Chesapeake & Ohio Railway Company acquired W & OD by an exchange of stock valued at approximately $450,000. In 1962, the commission authorized abandonment of 2.94 miles near Rosslyn, Virginia.

The Virginia Electric & Power Company and the State Highway Commissioner of Virginia have entered into contracts for the purchase of substantially all of W & OD's line conditioned upon approval of abandonment. The Virginia State Corporation Commission and the Supreme Court of Appeals of Virginia have sanctioned abandonment of W & OD's intrastate operations in the face of substantially the same opposition presented here.[3]

After extensive hearings, the examiner recommended to the commission that the present and future public convenience and necessity permitted abandonment. While the proceedings were pending before the commission, the Washington Metropolitan Area Transit Authority[4]

the Washington & Old Dominion Users Association.

Intervening defendants are Virginia Electric & Power Co., the Virginia Department of Highways, and the Washington & Old Dominion Railroad.

Motions to dismiss the intervenors are denied. Cf. Seaboard Airline R. R. v. United States, 268 F.Supp. 500, 505 (E.D.Va.1967).

3. Washington & Old Dominion Users Ass'n v. Washington & Old Dominion Railroad, 208 Va. 1, 155 S.E.2d 322 (1967). Initially, the protestants before the Interstate Commerce Commission questioned the jurisdiction of the Virginia State Corporation Commission to enter its order permitting abandonment of W&OD's intrastate operations. Cf. State of Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878 (1926). The Interstate Commerce Commission, when it reached the same conclusion as the Virginia regulatory authorities, recognized that the jurisdictional issue became moot.

4. The Washington Metropolitan Area Transit Authority was created in February 1967 by interstate compact among Maryland, Virginia and the District of Columbia. [80 Stat. 1324, 1966 U.S.Code Cong. & Ad.News, p. 1547; Maryland, Acts of General Assembly 1965, ch. 869; Virginia, Acts of Assembly 1966, ch. 2]. It is charged with planning, developing, financing and operating mass transit facilities in the area embracing the District of Columbia, the Virginia cities of Alexandria, Falls Church and Fairfax, the Virginia counties of Arlington and

was permitted to intervene, and at its request proceedings were stayed to permit it to determine the desirability of using portions of W & OD's line. for development of a regional transit system. Several months later the authority advised the commission that its interest in W & OD's line would be adequately protected by agreements with the Virginia Department of Highways and Virginia Electric & Power Company for rapid transit use of portions of the right-of-way. Thereafter, the United States Department of Transportation urged the commission to approve the proposed abandonment.

■ The commission adopted the material facts found by the examiner, modified his recommended certificate by imposing employee protective conditions, and granted its certificate. Statutory authority for the commission's action is found in § 1(18), (19), (20) and (22) of the Interstate Commerce Act [49 U.S.C. § 1(18), (19), (20) and (22)]. Section 1(18) provides in part:

"[N]o carrier by railroad * * * shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

In State of Colorado v. United States, 271 U.S. 153, 168, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926), Mr. Justice Brandeis said:

"The sole test prescribed is that abandonment be consistent with public necessity and convenience. In determining whether it is, the Commission must have regard to the needs of both intrastate and interstate commerce. * * * The benefit to one of the abandonment must be weighed against the inconvenience and loss to which the other will thereby be subjected. Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce. * * * The result of this weighing—the judgment of the Commission—is expressed by its order granting or denying the certificate."

Congress entrusted to the commission—not the courts—the duty to find the facts and exercise a reasonable judgment to determine the requirements of the public convenience and necessity. United States v. Detroit & Cleveland Nav. Co., 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38 (1945); Chesapeake & O. R. Co. v. United States, 283 U.S. 35, 42, 51 S.Ct. 337, 75 L.Ed. 824 (1931).

W & OD's right-of-way has deteriorated and its traffic is declining. It owns little equipment. It uses two of its three small locomotives and leases two others from the C & O, from which it also obtains freight cars. To maintain safety it must operate at speeds of five to ten miles per hour. Minimum rehabilitation of the line, permitting only low speed operation, would involve immediate outlays of considerable amounts, which the commission found could not be justified on the basis of present and prospective traffic.

During the five-year period, 1960–64, which preceded the application for abandonment, the number of carloads handled by W & OD has drastically

Fairfax, and the Maryland counties of Montgomery and Prince Georges.

The Northern Virginia Transportation Commission was created by the General Assembly of Virginia in 1964 [Virginia, Acts of Assembly 1964, ch. 630, p. 933]. It functions on behalf of the counties of Arlington and Fairfax and the cities of Alexandria, Falls Church and Fairfax. However, its power is limited. The enabling act [Virginia Acts of Assembly 1964, ch. 631, p. 939] states that it

" * * * shall not prepare a transportation plan nor construct or operate transit facilities * * *." While the Northern Virginia Transportation Commission is not itself a component of the Washington Metropolitan Area Transit Authority, the interstate compact of 1967 provides that the two Virginia directors of the authority shall be appointed by the transit commission from its own membership. [Virginia Acts of Assembly 1966, ch. 2, p. 8].

declined. It ranged from a high of 10,-898 to a low of 8,999 cars in 1964. While this case was pending, the reduction in traffic accelerated. 5,461 cars were moved in the first ten months of 1966, a decline of almost 25 per cent over the same period in 1965. The commission found that the line would require approximately 12,000 carloads per year to reach the break-even point.

In each of the five years, 1960–64, W & OD incurred a net loss of, respectively, $19,177, $77,593, $35,120, $16,994 and $55,880. Despite a large population growth in the area served by W & OD, few new industries have located along its right-of-way and the commission could find no reasonable prospect that operations would become profitable. While the commission recognized that some shippers and communities would be inconvenienced, it also noted adequate motor carrier service exists in the area and most of the communities are relatively close to other railroads, the most distant being 22 miles. The commission's judgment that the inconvenience to communities and shippers is outweighed by the burden placed upon interstate commerce in subsidizing this unprofitable venture finds substantial support in the record.

█ The plaintiffs charge that the commission erred in considering the substantial savings that would accrue to the Virginia Department of Highways if W & OD were abandoned. The evidence adequately supports the findings of the examiner and the commission that abandonment would permit the Highway Department to avoid high costs of grade separation projects and that it will result in a saving through the use of a portion of the abandoned right-of-way as a part of the new interstate highway system. These savings were estimated at $5,400,-000.[5] Consideration of these savings was proper in determining whether the public convenience and necessity would be served by abandonment even though the amounts were not chargeable against the railroad itself.

In Purcell v. United States, 315 U.S. 381, 385, 62 S.Ct. 709, 711, 86 L.Ed. 910 (1942), the construction of a dam flooded a roadbed, and relocation of the railroad would have been very costly. The commission's order authorizing abandonment of the road, instead of relocation, was upheld even though the government would pay the full cost of relocation. Mr. Justice Black said:

"This Court has recognized that operation of the national railway system without waste was one of the purposes the Transportation Act of 1920 was intended to further. * * * When materials and labor are devoted to the building of a line in an amount that cannot be justified in terms of the reasonably predictable revenues, there is ample ground to support a conclusion that the expenditures are wasteful whoever foots the bill."

The fact that relocation of the W & OD is not an alternative to abandonment does not preclude application of the sound principles found in *Purcell*.

The plaintiffs protest the determination that W & OD is operating at a loss. They urge that the railroad's failure to introduce records concerning its feeder value to the C & O and its subsidiary, the B & O, makes impossible an accurate determination of its loss, if any.

█ The commission long has recognized that when a railroad that is part of an integrated system seeks abandonment it is proper to determine the portion of system revenue derived from freight interchange with the line seeking abandonment in order to ascertain the true worth of the branch line. See Moeller v. ICC, 201 F.Supp. 583, 587 (S.D. Iowa 1962). Although W & OD is a separate corporation, and not technically a branch of the C & O, the commission

5. Officials from the Virginia Department of Highways testified that the estimated total savings to the Department for 12 specific projects if the railroad were abandoned approximate $5,900,000. From this must be subtracted the net cost, in the amount of $500,000, of the roadbed proposed for highway construction.

recognized that its " * * * operation *is more that of a C & O branch line than of a separate connecting line*, and consequently we consider WOD to be part of the C & O system." [6] The commission noted that the hearing did not produce specific evidence with respect to either the volume of traffic C & O would lose in the event of abandonment or the amount of revenue C & O and B & O received from traffic interchanged with W & OD, and that this evidence should have been presented to facilitate a decision. The commission, nevertheless, concluded: [7]

"On this record, however, the omission is not fatal. Other evidence, including WOD's accelerated decline in traffic and revenues makes it highly probable that the value of WOD's interchange traffic with C & O and B & O is of little significance. About half of WOD's traffic is interstate. Very little of it is outbound and therefore subject to WOD's routing influence as the originating carrier; and as to the great bulk of it—which is inbound— WOD receives traffic from five railroads. On 'local stone,' for example, which accounted for half the carloads of WOD's principal traffic in 1964, the Southern Railway was WOD's connection for 25 per cent of it. It thus appears that the feeder value of WOD to the C & O system is *de minimis* and that failure to include revenues from C & O-B & O interchange traffic has no material bearing on our ultimate conclusion herein."

The record amply supports the commission's finding that W & OD's feeder value is *de minimis*. While the commission undoubtedly should consider this factor in determining whether abandonment is proper, it need not make a mathematical computation of feeder value when the facts supporting the conclusion that it is slight are apparent. Cf. Transit Commission of State of New York v. United States, 284 U.S. 360, 370, 52 S.Ct. 157, 76 L.Ed. 342 (1932).

The plaintiffs challenge the finding of the examiner, adopted by the commission, that the break-even point for the railroad is 12,621 cars per year. The plaintiffs complain that this is based on the full cost of operation, and that inasmuch as W & OD is considered a branch line, the break-even point should be computed only on out-of-pocket costs. Using this computation, the plaintiffs contend that a proper figure is 8,800 cars. The commission's allocation of costs is neither arbitrary nor clearly erroneous and consequently it is not within our province to reject it. Moeller v. ICC, 201 F.Supp. 583, 588 (S.D. Iowa 1962). The important issue, however, is not the difference in computation of the break-even point. We are concerned with the influence of the road's prospects upon public convenience and necessity. Viewed in this light there is no deficiency in the commission's findings. W & OD estimated that its total annual carload traffic is not expected to exceed 6,425 cars, a figure considerably below the break-even point calculated by the plaintiffs. W & OD's estimate is corroborated by the most recent traffic counts available. The commission found it handled 8,364 cars in 1965, which was 635 less than in 1964, and that for the first ten months of 1966, it handled only 5,461 cars. Regardless of the costs the plaintiffs urge should be excluded from computation of a break-even point, it is apparent that the road operates at a considerable deficit.

We find no merit in the complaint that the evidence is insufficient to determine whether W & OD is obtaining a fair division or share of revenues from car movements participated in by the W & OD and one or more other carriers.

6. Page 14 of the commission's report. Washington & Old Dominion Railroad—abandonment—ICC finance docket No. 23492 (January 23, 1968).

7. Page 15 of the commission's report. Washington & Old Dominion Railroad—abandonment—ICC finance docket No. 23492 (January 23, 1968).

The divisions of revenue between W & OD and C & O and B & O and other railroads were arranged through arm's length negotiations before C & O control. There is no evidence that C & O has taken advantage of W & OD in arranging the divisions. For this reason the commission declined to order an investigation of the divisions.

■ Undoubtedly the commission can examine divisions in determining whether revenue received by the line seeking abandonment accurately reflects its operations. When, however, the divisions are *prima facie* correct and large sums would have to be spent for rehabilitation, the commission properly can decline to call for examination of the divisions. In a situation of this type, it is " * * * within the expert competence of the Commission to make such a judgment." Jay St. Connecting R. R. v. United States, 174 F.Supp. 609, 616 (E.D.N.Y.1959).

Contrary to the plaintiffs' assertions, none of the transactions between W & OD and C & O invalidates the commission's order. After W & OD and C & O decided to apply for abandonment, adjustments were made in W & OD's costs by retroactively charging the superintendent's salary and expenses, by increase in per diem car expense and by increase in locomotive rental that C & O had provided in the years 1960–64. The retroactive increases in operating expenses were $37,182 in 1960; $49,239 in 1961; $51,019 in 1962; $47,124 in 1963; and $57,899 in 1964. After extensive hearings and cost analysis, the examiner found that the charges made by C & O were not excessive. The superintendent carried on C & O's payroll devoted full time to W & OD. Quite properly, the examiner approved the intercorporate charging of his salary against W & OD as an expense of supervising the operation of the road. W & OD owns no freight cars. It rents from C & O. The principal complaint about car rental centers on free days. For many years, all the railroads with which W & OD interchanged allowed two free days per diem on carload shipments. In 1961 this practice was discontinued by all the carriers except C & O. Thus, the retroactive charge made by C & O was consistent with the charges made by other carriers. As the examiner noted, no good reason was advanced for treating C & O cars in a manner different from the cars of other railroads, and the evidence does not support the allegation that the charges were inaccurate. Further, the examiner's finding that a daily rental of $45.00 for locomotives was reasonable is supported by the evidence. A similar charge was quoted by a manufacturer, and a daily rental of $40.00 plus six cents a mile was quoted by another railroad.

Regardless of the retroactive charges, the record indicates that operation of the W & OD was not profitable. From 1960 to 1964, even without these expenses, it had an aggregate loss of approximately $50,000. The commission observed that if the charges were disallowed retroactively, they would have to be considered in future operations. W & OD could not expect to get cars, locomotives and a superintendent without paying a reasonable rental and salary. Future operations of the W & OD probably would continue at a loss. A predicted net loss of $115,000 for 1966 was confirmed in part by a loss for the first three quarters of the year of approximately $86,000. Other complaints about the C & O's exercise of control over the W & OD have not been shown to cause the W & OD deficits, and as the commission noted, they have no bearing on the public convenience and necessity.

We find no merit in the association's complaint that the commission used an improper period of time in examining the affairs of the W & OD. The application for abandonment was filed February 5, 1965. The principal years considered by the commission were 1960–64. The commission's rules prescribe that the applicant must furnish its income account for each of the five calendar years preceding the application for abandonment. 49 C.F.R. § 42.9. The data concerning 1965 and 1966 was developed at further

hearings and amply corroborated the railroad's lack of traffic and its operating deficits.

The plaintiffs urge that an opportunity should be afforded for interested persons to buy the road in order to continue and expand its operations. Undoubtedly the commission has the authority to impose such a condition upon its abandonment certificate and it has frequently done so.[8] The inclusion of a *salvage clause,* however, is discretionary. For two reasons we conclude the commission did not abuse its discretion by its refusal to include the clause. First, the record considered as a whole supports the commission's decision that the road cannot be profitably operated. The costs of rehabilitation are considerable, and the need for rail service, present or prospective, is insufficient to warrant continued operation. *Second, the commission* has not ignored the value of this *corridor* stretching for 48 miles through densely populated northern Virginia. The initiative for abandonment came from the Virginia State Highway Department's interest in purchasing the property. The commission stayed its proceedings to permit the Washington Metropolitan Area Transit Authority to secure its needs and it acted only after the United States Department of Transportation urged abandonment. The commission has no authority over the operations of the highway department or the transit authority[9] and could not conduct hearings as urged by the plaintiffs to determine whether they were properly discharging their duties. The commission did all that reasonably could be expected of it.

The relief which the plaintiffs seek is denied, and this action is dismissed.

---

8. Statutory authority is found in 49 U.S.C. § 1(20). Among the proceedings in which such a condition has been applied are: Okmulgee Northern Rwy. Co.—abandonment, 320 ICC 637 (1964); Chicago, Milwaukee, St. Paul & Pac. R. R. Co.—

*acquisition and abandonment,* 184 ICC 103, 109 (1932); Abandonment by Pennsylvania R. R., 131 ICC 547, 554 (1927).

9. Public Law No. 89–774, ¶ 77, 80 Stat. 1324, 1349.