**COMMONWEALTH OF PENNSYL-VANIA et al., Plaintiffs,**

v.

**UNITED STATES of America et al., Defendants.**

**Civ. A. No. 72-837.**

United States District Court,
W. D. Pennsylvania.
May 10, 1973.

---

J. Shane Creamer, Atty. Gen., Harrisburg, Pa., John M. Duff, Deputy Atty. Gen., Pittsburgh, Pa., Gordon P. MacDougall, Sp. Asst. Atty., Washington, D. C., Philip P. Kalodner, Harrisburg, Pa.,

J. Lee Miller, Thomas P. Shearer, Pittsburgh, Pa., for plaintiffs.

Richard B. Allen, Baltimore, Md., John J. Repcheck, Pittsburgh, Pa., James F. Tao, Interstate Commerce Commission, Washington, D. C., for defendants.

Before ALDISERT, Circuit Judge, and KNOX and SCALERA, District Judges.

## OPINION

SCALERA, District Judge.

This action seeks to set aside a certificate and order of the Interstate Commerce Commission (I.C.C.) dated June 13, 1972, which authorizes the Baltimore and Ohio Railroad Company (B & O) and the Indian Creek Valley Railroad Company to abandon a 17.57 mile branch rail line located in Fayette and Westmoreland Counties, Pennsylvania.

### HISTORY OF THE CASE

On December 9, 1971, the B & O and its wholly-owned subsidiary, the Indian Creek Valley Railroad Company, filed a joint application with the I.C.C. under 49 U.S.C. § 1 (18–20) of the Interstate Commerce Act. The railroads sought a certificate of public convenience and necessity permitting abandonment of the Indian Creek Valley Branch, which runs between Indian Creek and Roaring Run in Fayette and Westmoreland Counties, Pennsylvania. In addition to the main track, the railroads' petition requested permission to abandon .46 miles of side track, 8 turnouts, 7 bridges and 11 public highway grade crossings.

Various protests were entered against the abandonment and the application was assigned to a review board for handling under modified procedure by which evidence and arguments were submitted to the I.C.C. in written form. 49 C.F.R. 1100, 45–54. Protestants who filed verified statements were Babcock Lumber Company, the only patron served by the line, the United Transportation Union, the Commonwealth of Pennsylvania and the Pennsylvania Public Utility Commission (P.U.C.). The Commonwealth and the P.U.C. filed a joint statement. The record was closed on April 10, 1972. On June 13, 1972, the I.C.C.'s Review Board Number 5 entered a certificate and order accompanied by a report, granting the abandonment.

On September 14, 1972, petitions for reconsideration filed by the Babcock Lumber Company and jointly by the Commonwealth of Pennsylvania and the Pennsylvania Public Utility Commission were denied by Division 3 of the I.C.C., sitting as an appellate division. The Commission's June 13 order was to become effective on October 22, 1972, twenty days from the date of service of the order denying reconsideration.

This complaint seeking to enjoin, suspend and set aside the order of the I.C.C. was filed on October 10, 1972. In compliance with 28 U.S.C. §§ 2284 and 2325, a three-judge court was convened.

Parties to the action stipulated that the authority for abandonment would not be exercised prior to January 15, 1973. Briefs were ordered in accordance with the schedule proposed by the parties and a hearing was held on January 26, 1973.

### REVIEW OF EVIDENCE PRESENTED IN PROCEEDINGS BEFORE THE INTERSTATE COMMERCE COMMISSION

The railroads argued before the I.C.C. that there was insufficient business on the line to justify its continued operation. They presented evidence to show that since the closing of the Melcroft Mine in 1967, traffic on the line has been less than 2 carloads per week. As a result, the branch has been operated unprofitably for the past 3 years. In order to conserve losses only minimal amounts were expended on maintenance during this period, most of which was spent to have the track inspected in its entirety before each operation. Little actual maintenance work was performed on the line.

The railroads contended that as a result, the track and bridges are now in such poor condition that major rehabilitation is required. It was estimated that it would cost $839,800 to restore the line to satisfactory operating condition in compliance with Federal Railroad Administration (F.R.A.) Class 2 safety standards, which permit operating speeds of 11 to 25 m. p. h., and $50,000 annually to maintain the line under this classification. The railroads concluded that the small volume of traffic and the unlikelihood of an increase in traffic did not justify such a substantial rehabilitation expenditure as well as continued operating losses.

Babcock argued that its use of the line had been increasing and that more cars could have been utilized but the railroad had been "unable or unwilling" to provide them. Considerable sums were recently spent by Babcock to improve its Roaring Run operation in reliance on the continued availability of railway service. It was asserted that elimination of the branch would adversely affect Babcock's business, necessitating a reduction of its lumbering force.

The Commonwealth of Pennsylvania and the P.U.C. argued that at the present volume of traffic a major rehabilitation is not required for safe operation of the branch. Moreover, they contended that the line does not need to be upgraded to comply with F.R.A. Class 2 requiremements. The Commonwealth and the P.U.C. argued that with a maintenance expenditure of $10,000 per year, an increase of approximately $4,000 over current maintenance expenditures, the line could be safely operated at the existing volume of traffic for the next 5 years without a major rehabilitation.

Averring that the railroads' current operating losses are *de minimis,* the Commonwealth of Pennsylvania and the P.U.C. further argue that abandonment of line should not be permitted in an economically depressed area unless it is clear that the railroad will suffer substantial losses, as rail transportation is necessary to promote needed industrial development.

The Transportation Union adopted the arguments of the other protestants.

## FINDINGS OF THE INTERSTATE COMMERCE COMMISSION

The review board concluded that public convenience and necessity permit abandonment of the branch. It found that operation of the branch had been unprofitable in the past and would continue to be unprofitable in the future even with minimal maintenance expenditures. The board found that traffic on the branch had dropped to about 2 cars per week, a volume which made it impossible for the railroads to break even financially. No convincing evidence had been introduced that new traffic would be generated sufficient for profitable operation of the branch.

The board noted that although there was no reason to upgrade the line to permit speeds up to 25 m. p. h., considerable rehabilitation was necessary for safe operation of the branch. The cost of required rehabilitation was so great that the railroads would never be able to recoup this expenditure from business on the line.

Balancing the unprofitable operation and the need for substantial rehabilitation against the public need for rail service, the review board found that although Babcock would probably suffer financial harm from discontinuation of the line, the public would be more effectively served if the railroad's good financial position were not weakened by requiring it to continue operation of an unprofitable line in need of extensive rehabilitation.

## REHABILITATION

Plaintiffs argued before this court that the Commission's determinations that operation of the branch is unprofitable, that substantial rehabilitation is required for continued operation, and that the costs of rehabilitation cannot be recovered from business on the line are

not supported by adequate findings and by substantial evidence. Plaintiffs attack the Commission's rehabilitation determination for several reasons. They attack as inadequate the Commission's finding that considerable rehabilitation is needed for safe operation because the Commission failed to set forth the cost of rehabilitation required. Plaintiffs argue that when a decision to grant abandonment is predicated in large part on a finding that substantial rehabilitation is necessary, which issue was contested in proceedings before the Commission, an estimate of the cost of rehabilitation is required to permit the Commission's decision to be challenged on grounds of lack of substantial evidence as well as to assure proper judicial review.

The plaintiffs contend that because the railroad only presented evidence on the amount of rehabilitation which would be required in order to comply with the F.R.A. Class 2 safety standards which the Commission found did not have to be met, and because the railroads failed to present an estimate on the amount of rehabilitation which would be required to comply with Class 1 standards, the evidence presented by the P.U.C. expert that no rehabilitation is needed to comply with Class 1 standards should have been controlling.

Plaintiffs also contend that the opinion of the P.U.C. expert on the rehabilitation issue should have been binding on the Commission because the Commission has little or no expertise in matters of railway safety, whereas the P.U.C. presently has jurisdiction over railway safety for lines in the Commonwealth and it is anticipated that it will soon be certified as the agency which will administer track safety standards adopted by the U.S. Secretary of Transportation under the Railway Safety Act of 1970, 45 U.S.C. § 421.

Finally, it is asserted to be error for the board to have rejected the railroad's estimate of rehabilitation as excessive but, nevertheless, to have relied on this estimate instead of accepting the estimate of the P.U.C. expert.

 We do not think the board's rehabilitation determination is inadequate. The Commission may determine that substantial rehabilitation is needed for safe operation without setting forth an approximation of the expenses involved. As was said in Transit Commission v. United States, 284 U.S. 360, 370, 52 S. Ct. 157, 159, 76 L.Ed. 342, 348 (1932):

> [I]n the issuance of a certificate of public convenience and necessity the Commission need not determine with mathematical exactness the extent of the burden imposed upon interstate commerce by the operation of a branch line; . . . such burden might involve various elements, and . . . if upon the whole proof the conclusion was warranted that continued operation would in fact unreasonably burden the interstate commerce of the carrier, the Commission was justified in authorizing abandonment.

*See also* Village of Candor v. United States, 151 F.Supp. 889 (N.D.N.Y. 1957); Moeller v. I. C. C., 201 F.Supp. 583 (S.D.Iowa 1962); New York v. United States, 299 F.Supp. 989 (N.D.N.Y.1969); Washington and Old Dominion Users Ass'n v. United States, 287 F. Supp. 528 (E.D.Va.1968).

In Village of Candor v. United States, *supra*, the I.C.C. deemed inconclusive evidence regarding the future financial implications of operating a branch which the railroad was seeking to abandon. Although the Commission did not accept in its entirety evidence submitted by the railroad regarding future maintenance costs, the Commission's finding that substantial rehabilitation equal to or in excess of earnings would be required was held to be adequate.

The finding of the Commission in *Candor* is similar to the finding in the instant case. Although the review board found the railroads' estimate to be somewhat overstated, the board found substantial rehabilitation was necessary and

this expenditure could never be recovered from operation of the line.

■ We do not think the Commission should be required to engage in guesswork and speculation to come up with an exact figure. *See* Soo Line R. R. v. United States, 271 F.Supp. 869 (D. Minn.1967). This determination made in this case is adequate. The finding is sufficiently specific to permit us to perform our limited review function, *i. e.*, to determine whether the conclusions reached are supported by substantial evidence, that is, whether there is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." Illinois Cent. R. R. v. Norfolk & Western R. R., 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162, 169 (1966). Furthermore, we find there is ample evidence in the record to support the board's conclusion that substantial rehabilitation is needed even if the railroad is only required to comply with Class 1 P.U.C. standards.

According to the verified statements of 2 engineer employees of the B & O, the bulk of the track is 50 years old, the remainder is 45, and all is badly worn. The high rail on a number of curves is worn into the web of the rail and should be replaced immediately. There are pressure cracks on the low rail of 2 curves which will develop into head and web separations and could result in a derailment if not replaced. Many crossties are decayed and dry rotted with no spike holding area. By actual count 12,000 ties need immediate replacement to comply with minimal requirements for safe operation at very low speeds, which is that there be at least 1 good crosstie under each rail joint and 1 good tie between every 4 joints.

In September of 1971, heavy rainfalls caused serious washouts in portions of the track. The branch was closed for approximately 3 weeks, during which time temporary repairs were made at a cost of more than $20,000. The damage caused by these washouts has not been permanently repaired. The entire line needs to be reballasted and surfaced to prevent a derailment which is otherwise likely to occur. There are virtually no ditches left on the bank side of the railroad or cross drains, making an extensive washout likely in the event of heavy rains. Sinks or soft spots in the roadbed need to be stabilized. There is no berm or shoulder in many places on the creek side of the railroad to hold the roadbed in place or to afford room for employees to disembark and walk if the train stops in these locations. Bridge No. 2, which was washed out in the September 1971 rainstorm, needs a wingwall, without which the east end of the bridge is likely to be washed out should there be heavy rains. Eighty percent of the ties on the bridge and the timber guard rail are rotted out and need to be replaced.

■ We do not think that because the P.U.C. has filed an application for certification to administer track safety standards adopted by the Secretary of Transportation, the testimony of the P. U.C. expert is binding on the Commission or is entitled to any more weight than is accorded any expert offering evidence to the Commission. Rejection of the expert's testimony does not compel the Commission to make more specific findings than it is otherwise required to do.

## FINANCIAL RESULTS OF OPERATION

With respect to the Commission's finding that operation of the line has been unprofitable in the past and will be unprofitable in the future, plaintiffs contend the board improperly calculated the financial results of operating the branch for the years 1969, 1970 and the first 6 months of 1971, because the board failed to include revenues accruing to the Chesapeake and Ohio Railway (C & O) and the Western Maryland Railway in its financial analysis of branch operation. Plaintiffs further contend the board erred in finding that

future operation will be unprofitable when the railroad's expenses for inspection will have disappeared after rehabilitation.

Plaintiffs argue that under Commission procedure, whenever railroads exist as part of a railroad "system" or "family," the off-branch revenues accruing to the entire "system" or "family" are taken into account in the financial analysis of operation of the branch. They contend that the C & O, B & O and the Western Maryland Railroad Company are part of the same "system" or "family," and the Commission failed to include off-branch net revenues accruing to the latter railways in computing the branch's deficit which would have reduced that deficit. Plaintiffs contend this is a departure from prior procedures analyzing financial data which may not be made unless adequately explained.

That is to say, they assert that the board made a specific finding that the net operating deficits resulting from the operation of the branch amounted to $1,572 in 1969, $2,933 in 1970, and $1,919 for the first 6 months of 1971, and this finding is incorrect because it only reflects the financial results of operating the branch for the B & O system. Plaintiffs contend these figures fail to take into account the net operating income accruing to the C & O and the Western Maryland Railway from operation of the branch in the amounts of $1,381, $13, and $15 for the same periods. These amounts, it is claimed, reduce the net operating deficit for branch operation to $191 for 1969, $2,920 for 1970, and $1,904 for the first half of 1971.

We do not think that the board made a specific finding as to the financial results of operating the branch. Although it indicated in reviewing the evidence and contentions of the parties that the railroads had computed the net railway operating deficits to be $1,572, $2,933 and $1,919 for the above-mentioned periods, the board did not make a specific determination in its discussions and con-

clusions. Its finding was that from all the evidence submitted, "the revenues provided by the traffic on the branch in the past have not been and in the foreseeable future would not be sufficient to allow a profitable operation, even with very minimum maintenance of the line." (Report, p. 6).

We cannot assume that because the evidence as to the revenue accruing to the family line from branch operations which was submitted to the Commission was not discussed in the report, that it was not considered by the Commission in making its decision. Stott v. United States, 166 F.Supp. 851, 862 (S.D.N.Y.1958); Columbia Transportation Co. v. United States, 167 F.Supp. 5, 15 (E.D.Mich.1958). It has been held that there is no need to compute the feeder value when the facts supporting the conclusions that it is slight are apparent. Washington and Old Dominion Users Ass'n v. United States, *supra,* 287 F. Supp. at 533.

Even when family branch revenues are taken into account, the results are still in conformity with the critical decisional fact that the branch was operating at a deficit during these periods. The difference in the operating deficit for the 1970 and 1971 periods is only $13 and $15 respectively. We find it very difficult to believe the Commission would change its conclusion based upon a *de minimis* reduction in the branch's operating deficit. We further note that only the first 6 months of 1971 were analyzed. Had the financial results of operation for the entire year been taken into account, the operating deficit would have been greatly increased due to the $20,000 emergency expenditure occasioned by the September, 1971, washout.

Babcock contradicts its position on other issues in this case and its own evidence by asserting that after rehabilitation, the majority of the railroad's expenses will disappear and the line can be operated profitably. Plaintiffs' position before the Commission and the court has been that the major rehabilitation is not required to continue opera-

tion of the branch. Their expert asserted the line could be safely operated for the next 5 years without a major rehabilitation with maintenance expenditure of $10,000 per year, an approximate $4,000 increase over current expenditure. If the opinion of their expert had been adopted, operating expenses in the future would be greater than they were in the past, resulting in increased operating deficits in the future.

■ The railroads asserted to the Commission that it would cost $50,000 annually to maintain the line after a major rehabilitation. There is therefore evidence in the record to support the conclusion that the majority of the railroad's expenses will not disappear after rehabilitation, even though the close inspection of the line which is now being made because the track is in such poor condition may no longer be necessary.

*Carloads handled on the branch*

■ Plaintiffs argued that the board erred in finding there was insufficient business on the branch to support continued operation. Babcock contends the number of carloads shipped over the line has been increasing over the past three years and that the number of carloads would have been greater had the railroad complied with its request for more and better cars. Babcock argues that the railroad cannot claim insufficient business on the line as a basis for abandonment because it created this situation by its continued resistance and delay in providing cars.

The evidence submitted to the Commission and reviewed in its report shows that in fact the number of carloads decreased in 1970. In 1969, 1970 and 1971, 83, 60 and 94 carloads were handled on the branch. Furthermore, traffic on the line over the past three years was less than it had been in prior years due to the closing of the Melcroft Mine in 1968. In 1967 the line handled 546 carloads of freight and in 1968, 62 carloads were handled.

No evidence was introduced to substantiate Babcock's claim that its use of the line would have increased had more cars been provided or that it has been damaged by the unavailability of cars to ship its goods. It did not show that it was unable to fill orders, that it was forced to use alternate methods of shipment, or that it lost business due to its inability to obtain rail transportation.

We note that there is a freight car shortage in this country and shippers frequently are required to wait for cars to ship their merchandise. *See* United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed. 453 (1972). The fact that cars are not available immediately on request is not an argument against authorizing abandonment.

*Public necessity*

Plaintiffs further contend that the board failed to take their public necessity arguments into consideration in granting abandonment. Babcock asserts the board ignored its arguments that the proposed abandonment will be harmful to the public in that it will produce a discharge of workers at a time when such layoffs should be avoided and will reduce the export of materials at a time when the public needs require that exports be increased. Furthermore, Babcock argues it will be harmed by the proposed abandonment because alternative transportation is economically prohibitive.

Babcock argued to the Commission that the benefit to the nation resulting from the transport of its product should be taken into consideration in determining whether abandonment is appropriate. Shipment of its lumber provides income to the rail system across the country both in the initial shipment of the wood and in the shipment of finished products made from the wood, generating jobs for railway personnel and persons who transfer, utilize, fashion and market the wood. Although they admit their business is too small

to substantially affect the national job and export market, they assert precedent which allows abandonment in disregard of small business can cumulatively affect the national economy.

It was also argued that because there was no other method of shipment as inexpensive as rail transportation, elimination of the branch would have a detrimental economic impact on this lumbering business and would necessitate a reduction of its lumbering force. During the September, 1971, washout, trucks were used to fill contractual commitments at a net loss for each load due to the trucking costs and double handling. Whereas the cost of rail transportation amounts to approximately $6 per 1,000 board feet of lumber, it cost $24 per 1,000 board feet to use trucks during the emergency period.

All of the facts and arguments set forth by Babcock in opposition to the proposed abandonment were reviewed in the report of the Commission and considered in its conclusions. The board specifically indicated that it had considered possible injury to Babcock and the general area carefully in determining that abandonment was appropriate. In weighing the losses to the railroad against the public need for continuation of the line, it found that although Babcock would probably suffer financial harm, the public would be more effectively served in other areas if the railroad's good financial posture were not weakened by requiring it to operate unprofitable lines.

■ In almost all cases there is some adverse effect resulting from abandonment. This does not prevent abandonment of line. It is well settled that a shipper cannot insist that a burdensome line be maintained solely for its own use. Moeller v. I. C. C., *supra*; Village of Candor v. United States, *supra*; Town of Inlet v. New York Cent. R. Co., 7 F.Supp. 781 (N.D.N.Y.1934).

The very purpose and function of the Commission is to identify and weigh the various interests that would be affected by the abandonment with a view toward promoting a national transportation system adequate to meet the nation's needs.

The benefit to one of the abandonment must be weighed against the inconvenience and loss to which the other will thereby be subjected. Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce . . .. The result of this weighing—the judgment of the Commission—is expressed by its order granting or denying the certificate. Colorado v. United States, 271 U.S. 153, 168, 46 S.Ct. 452, 456, 70 L.Ed. 878, 885 (1926).

■ The balancing of competing interests to determine the public convenience and necessity is peculiarly within the competence and discretion of the I. C.C. I. C. C. v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945):

This determination of whether the public interest would be best served by continuing or discontinuing the trains is a question that requires the exercise of informed expert judgment and the weighing and balancing of many complicated and intricate facts. State of New York v. United States, *supra*, 299 F.Supp., at 1001 (N.D.N. Y.1969);

subject only to the limited court review mentioned heretofore. There is ample evidence in the record to support the balance for which the Commission has opted.

■ We think the Commission's findings with respect to rehabilitation costs and operating losses are adequate and supported by substantial evidence. The Commission did not err in finding there was insufficient traffic on the line to support the line's continued operation, nor did the Commission fail to consider Babcock's public necessity arguments.

An appropriate order will be entered.