**STATE OF NEW YORK, Plaintiff,**

**Broome County Chamber of Commerce, Intervenor-Plaintiff,**

v.

**UNITED STATES of America, and Interstate Commerce Commission, Defendants,**

**Erie-Lackawanna Railroad Company, Intervenor-Defendant.**

**Civ. A. No. 67-CV-207.**

United States District Court
N. D. New York.

March 4, 1969.

Louis J. Lefkowitz, Atty. Gen., Dunton F. Tynan, Asst. Sol. Gen., Andrew P. Goldstein, Walter J. Myskowski, Washington, D. C., for State of New York.

George G. Coughlin, Coughlin, Dermody, Ingalls & Guy, Binghamton, N. Y., for intervenor-plaintiff.

Donald F. Turner, Asst. Atty. Gen., Justin J. Mahoney, U. S. Atty., John H. D. Wigger, Atty., Dept. of Justice, for United States.

Robert W. Ginnane, Gen. Counsel; Jerome Nelson, Atty., Interstate Commerce Commission, for Interstate Commerce Commission.

Wallace R. Steffen, Cleveland, Ohio, for intervenor-defendant.

Before WATERMAN, Circuit Judge, and FOLEY and PORT, District Judges.

WATERMAN, Circuit Judge:

The State of New York commenced this action pursuant to 28 U.S.C. §§ 2321–2325 seeking to enjoin, suspend, set aside and annul, or to remand for further consideration a Report and Order of the Interstate Commerce Commission entered November 4, 1966 in Finance Docket No. 24205, Erie-Lackawanna Railroad Co., Discontinuance of Trains, 330 I.C. C. 508 (1966), reconsideration denied by order dated May 12, 1967, permitting the discontinuance of passenger trains 1 and 2 between Hoboken, New Jersey, and Chicago, Illinois ("The Phoebe Snow") [1] and passenger trains 21 and 22 between Hoboken, New Jersey, and Binghamton, New York.[2] The Com-

---

1. These two daily "name" trains, Nos. 1 and 2, were so designated to perpetuate the memory of "Phoebe Snow," a fictional character created by the Delaware-Lackawanna & Western some seventy years ago and who, for several decades was the central figure in that road's advertising programs designed to stimulate its passenger traffic. The D L & W was a leading carrier of anthracite or stone coal and the road's steam locomotives burned stone coal. Phoebe was depicted as being able to travel the D L & W system without having to worry about getting soft coal cinders on her snow-white costume. Many jingles were written about her— and just as many parodies of the jingles. In the standardized jingle attractive Phoebe informed travelers that "My gown stays white from morn to night upon the road of anthracite."

2. The trains involved were described by the Commission as follows:

Trains 1 and 2 (The Phoebe Snow) operate daily in each direction between Hoboken and Chicago, serving Binghamton. Trains Nos. 21 and 22 operate daily in each direction between Ho-

mission found that the operation of the four trains was not required by public convenience and necessity and that the continued operation thereof would unduly burden interstate commerce or foreign commerce

The proceedings in this case commenced with a notice and supporting statement of an Erie-Lackawanna Railroad Company proposal, filed with the Commission on June 15, 1966 pursuant to Section 13a(1) of the Interstate Commerce Act, 49 U.S.C. § 13a(1),[3] to discontinue the four passenger trains effective July 16, 1966. By order of June 30, 1966, the Commission instituted an in-

---

boken and Binghamton over the carrier's Delaware Division, which is located to the north of the main-line route of trains Nos. 1 and 2 and is approximately 20 miles longer. Trains Nos. 21 and 22 serve 15 intermediate stations not on the route of Trains 1 and 2. Patrons departing from or destined to those stations may make connections with Trains 1 and 2 for Chicago and intermediate points as follows: Train 21 westbound arrives in Binghamton at 12:50 p. m. and Train No. 1 arrives in Binghamton at 2:30 p. m.; train No. 2 eastbound arrives in Binghamton at 1:33 p. m. and train No. 22 leaves Binghamton at 2:25 p. m. The four trains connect with New York City via ferry and also via the Hoboken tubes of the New York Port Authority which serve the same station in Hoboken. Train No. 1 leaves Hoboken at 10:00 a. m., and arrives in Chicago the following morning at 8:00 a. m. Train No. 2 leaves Chicago at 6:30 p. m., and arrives in Hoboken the following evening at 6:20 p. m. 330 I.C.C. at 509.

3. § 13a(1) reads:
§ 13a. Discontinuance or change of the operation or service of trains or ferries; notice; investigation; hearing; determination
(1) A carrier or carriers subject to this chapter, if their rights with respect to the discontinuance or change, in whole or in part, of the operation or service of any train or ferry operating from a point in one State to a point in any other State or in the District of Columbia, or from a point in the District of Columbia to a point in any State, are subject to any provision of the constitution or statutes of any State or any regulation or order of (or are the subject of any proceeding pending before) any court or an administrative or regulatory agency of any State, may, but shall not be required to, file with the Commission, and upon such filing shall mail to the Governor of each State in which such train or ferry is operated, and post in every station, depot or other facility served thereby, notice at least thirty days in advance of any such proposed discontinuance or change. The carrier or carriers filing such notice may discontinue or change any such operation or service pursuant to such notice except as otherwise ordered by the Commission pursuant to this paragraph, the laws or constitution of any State, or the decision or order of, or the pendency of any proceeding before, any court or State authority to the contrary notwithstanding. Upon the filing of such notice the Commission shall have authority during said thirty days' notice period, either upon complaint or upon its own initiative without complaint, to enter upon an investigation of the proposed discontinuance or change. Upon the institution of such investigation, the Commission, by orders served upon the carrier or carriers affected thereby at least ten days prior to the day on which such discontinuance or change would otherwise become effective, may require such train or ferry to be continued in operation or service, in whole or in part, pending hearing and decision in such investigation, but not for a longer period than four months beyond the date when such discontinuance or change would otherwise have become effective. If, after hearing in such investigation, whether concluded before or after such discontinuance or change has become effective, the Commission finds that the operation or service of such train or ferry is required by public convenience and necessity and will not unduly burden interstate or foreign commerce, the Commission may by order require the continuance or restoration of operation or service of such train or ferry, in whole or in part, for a period not to exceed one year from the date of such order. The provisions of this paragraph shall not supersede the laws of any State or the orders or regulations of any administrative or regulatory body of any State applicable to such discontinuance or change unless notice as in this paragraph provided is filed with the Commission. On the expiration of an order by the Commission after such investigation requiring the continuance or restoration of operation or service, the jurisdiction of any State as to such dis-

vestigation of the proposed discontinuance and ordered the trains continued meanwhile. A Commission trial examiner held twelve days of public hearings in New York City; Scranton, Pennsylvania; Elmira, New York; Huntington, Indiana; Chicago; Binghamton, New York; Port Jervis, New York; and Washington, D. C. Some 1600 pages of transcript were needed to report the testimony taken at these hearings and over 100 exhibits were introduced by parties. Because of the statutory limitation upon the time available for investigation and decision, the Commission's June 30 order provided that a trial examiner's initial report and recommended order be omitted and, instead, provided that the hearing record be certified to the Commission, Division Three, for initial decision.[4] Interested parties were permitted to file briefs with the Commission. Thereafter the Commission, Division Three, issued the November 4 report and the Commission's § 13a investigation was discontinued.

The four trains stopped running on November 29, 1966. On December 9, 1966, some five days before the initial order discontinuing the investigation was to become effective, the State of New York, in accordance with the provisions of 49 U.S.C. § 17(8) and the Commission's General Rules of Practice, filed a petition with the Commission for reconsideration. This petition for reconsideration automatically stayed the earlier order discontinuing the investigation. Division Three, acting as an Appellate Division, denied the petition for reconsideration by order served May 19, 1967. Promptly thereafter, on June 14, 1967, the within action was commenced in the Northern District of New York and a three judge district court was convened in accordance with 28 U.S.C. § 2284.

The Erie-Lackawanna Railroad Company (hereinafter referred to as "E-L") and the Broome County Chamber of Commerce were permitted to intervene in this action without objection, the former as a defendant and the latter as a plaintiff. The E-L raised a jurisdictional question in its brief and moved for dismissal of the action on the ground that the federal district court lacked jurisdiction to review the Commission's decision. The court holds that it has jurisdiction over the parties and the subject matter, denies the motion to dismiss, and sustains the decision of the Interstate Commerce Commission.

E-L's jurisdictional question is based on the argument that an Interstate Commerce Commission order to terminate a § 13a investigation, after the Commission has entered into a full in-

---

continuance or change shall no longer be superseded unless the procedure provided by this paragraph shall again be invoked by the carrier or carriers.

4. Mr. John W. Bush, Chairman of the Interstate Commerce Commission, described the investigatory process which the Commission follows in § 13a(1) cases as follows:
    * * * In order to meet the severe time limitations imposed in Section 13a(1), the Commission as a regular practice omits preparation and service of an initial report by the examiner who has heard the evidence in these interstate train cases. In other words, the initial decision is made by division 3, the Commission's Finance Division, as soon as practicable following the close of the hearing.

The Commission's rules of practice provide in such a situation, that, where the initial decision in a case is made by a division of the Commission rather than by the hearing examiner, that the parties may, as a matter of right, file a petition for reconsideration of that decision. In the usual case, such a petition would be considered by the same division, acting as an appellate body. The Commission's internal organization rules provide, further, that any division may call upon the entire Commission to consider any case before the division, and also that the entire Commission may recall and bring before itself any case assigned to a division. Hearing on S.Res. 284 Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, 89th Cong., 2d Sess., ser. 76, at 14 (1966).

vestigation and completed the investigation is not a reviewable order within the meaning of 28 U.S.C. § 1336. This argument has been advanced to other three judge district courts when court review has been sought after the termination of a § 13a investigation, and it has been rejected in two reasoned and learned opinions, Vermont v. Boston and Maine Corp., 269 F.Supp. 80 (D.Vt. 1967); City of Williamsport v. United States, 273 F.Supp. 899 (M.D.Pa. 1967), affirmed, 392 U.S. 642, 88 S.Ct. 2286, 20 L.Ed.2d 1348 (1968) (per curiam). We are in agreement with the reasoning of the *Vermont* and the *City of Williamsport cases.* We reject the contrary conclusions reached by the three judge courts in New Hampshire v. Boston and Maine Corp., 251 F.Supp. 421 (D.N.H. 1965); and in Minnesota v. United States, 238 F.Supp. 107 (D.Minn.1965).[5]

■ Having decided that we have jurisdiction over this case, we proceed to discuss the merits. Our function in this type of case is limited to determining whether there is substantial evidence on the record as a whole to support the Commission's findings and whether the proper legal standards were applied by the Commission to the facts as the Commission found them to be. See, *e. g.,* Illinois Central R. Co. v. Norfolk & Western Ry. Co., 385 U.S. 57, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); cf. Consolo v. Federal Maritime Commission, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Petitioner and intervenor Broome County attack as clearly erroneous the Commission's finding that the continued operation of the four trains was not required by public convenience and necessity and the determination that continued operation of the trains would unduly burden interstate commerce.

On the first branch of its findings, those relative to public convenience and necessity, the Commission relied on evidence that there was a declining number of passengers utilizing the involved four trains over the 1,000 mile run and a decline in head-end usage; that adequate alternate rail service was available between most of the points serviced by the four trains; and that adequate, but in some cases less convenient, passenger service by private car, bus, and airplane was also available in the area the trains served. Its findings that continued operation would unduly burden interstate commerce were based upon its evaluation of the effect a continuation of the passenger service would have on the ongoing financial condition of the carrier. In arriving at this evaluation the Commission considered the carrier's past operating loss and its projected future losses occasioned by providing the involved passenger service, and it concluded that continuation of the passenger service could jeopardize E-L's recovery from past financial difficulties and that the discontinuation of that service would result in an improvement in the carrier's net income.

The 1963–1966 passenger traffic on these four trains which, as the Commission found, clearly demonstrates an accelerating decline in passenger usage, is set forth in 330 I.C.C. at 520–21:

Passenger utilization.—Passenger statistics are actual for the periods used. Commencing on February 1, 1963, the count and revenues have been compiled by electronic processing machines from conductors' ticket collections and cash ticket sales. Statistics for 1963 are for the 11-month period from February 1, and for 1964, 1965, and the first quarter of 1966, they are for the full period. The fol-

---

5. The witness at the Hearing on S.Res. 284 Before the Subcomm. on Surface Transportation of the Senate Committee on Commerce, 89th Cong., 2d Sess. ser. 76 (1966) raised and discussed many of the problems caused by the present form of

§ 13a(1). The general opinion of the members of the subcommittee was that Section 13a was not intended to prohibit court review of a commission order terminating a discontinuance investigation.

lowing table shows the daily average number of revenue passengers using the trains and the percentage decline from the base year 1963:

|      | Train No. 1 | | Train No. 2 | | Train No. 21 | | Train No. 22 | |
|------|-------------|-----|-------------|-----|--------------|-----|--------------|-----|
| 1963 | 280.15 |     | 278.85 |     | 38.84 |     | 38.26 |     |
| 1964 | 248.08 | 11% | 246.61 | 12% | 23.35 | 40% | 25.15 | 34% |
| 1965 | 223.26 | 20% | 243.53 | 13% | 20.56 | 47% | 25.35 | 34% |
| 1966 | 164.38 | 41% | 179.96 | 36% | 12.90 | 67% | 15.87 | 59% |

The findings as to alternate service are as follows:

There is continued and increasing competition from private automobiles in intercity passenger transportation, accelerated by the growth of the Interstate Highway System and the growing mileage of limited access highways. Bus transportation, by reason of those same highways and lower bus fares, remains a strong competitor. Air carriers are attracting larger shares of the long-distance traffic with the increasing use of jet planes which can make the flight from New York or Newark to Chicago in approximately two hours compared with approximately 23 hours by train. E-L's alternate service by trains Nos. 5, 6, 15, 17, and 10, and by its New Jersey commuter trains, has been previously outlined. No. 5 leaves Hoboken at 7:30 p. m. and arrives in Scranton, Pa. about 11:00 p.m. It leaves Jamestown, N. Y. about 6:00 a. m. and proceeds through the day to Chicago. No. 6 leaves Chicago at 10:35 a. m. and arrives in Jamestown at 11:00 p. m. It leaves Cresco, Pa. about 6:30 a. m. and proceeds in daylight to Hoboken. Thus, on these segments of the route, the alternate E-L trains run at relatively convenient hours. For about 300 miles between the Scranton-Cresco area and Jamestown, on the other hand, this alternate service is at night and would not be as convenient as the Phoebe Snow for passengers who prefer daytime travel. Over about two-thirds of that 300-mile segment (the portion east of Hornell, N. Y.), there is considerable bus service along the route of the Phoebe Snow and much of it is provided the full distance to and from New York City. Between Jamestown and Hornell, trains Nos. 1 and 2 stop at eight communities which would have neither daytime train service nor convenient air or bus service. These communities in 1965 produced, on the average, fewer than two boarding or deboarding passengers per train. The largest is Olean, N. Y., which averaged about five "ons" and five "offs," but the patronage from the others was *de minimus*. Olean has daily New York City service via another railroad.

Of the points served by trains Nos. 21 and 22, most have frequent bus service, both between intermediate points, and between those points and the termini. Only four would not have direct bus service. Together these four communities have a population of but 3,600, and produced an average of four or five passengers per train. Lacking rail service, these passengers could, with minimal discomfort, go by automobile about 8 to 20 miles to the nearest regular bus stop. In addition, there is other rail passenger service between New York and Chicago, serving some of the points here involved. Many bus and air schedules provide alternate service to most of the communities served by the four trains. 330 I.C.C. at 521-522.

The carrier submitted a summary of the revenues it received from and the operating expenses of the four trains. This summary appears in the margin.[6]

Erie-Lackawanna Railroad Company summary of revenues and expenses train numbers 1, 2, 21 and 22 for the years 1963, 1964 and 1965

| Line No. | | 1963 | 1964 | 1965 | Inc. or (Dec.) 1965 vs. 1963 | Percent Inc. or (Dec.) | Reference Sheets 2, 3 and |
|---|---|---|---|---|---|---|---|
| | OPERATING REVENUE: | | | | | | |
| 1 | Passenger | $1,765,589 | $1,638,883 | $1,489,832 | $ (275,757) | (15.6) | Line 1 |
| 2 | Baggage | 5,582 | 7,940 | 3,859 | (1,723) | (30.9) | " 2 |
| 3 | Mail | 2,199,909 | 1,991,324 | 1,949,976 | (249,933) | (11.4) | " 3 |
| 4 | Express | 640,765 | 391,017 | 183,709 | (457,056) | (71.3) | " 4 |
| 5 | Other Passenger - train | 31,054 | 37,344 | 36,600 | 5,546 | 17.9 | " 5 |
| 6 | Milk | 80,971 | 68,637 | 41,325 | (39,646) | (49.0) | " 6 |
| 7 | Dining and buffet | 183,497 | 168,421 | 168,537 | (14,960) | (8.2) | " 7 |
| 8 | Total Railway Operating Revenue | 4,907,367 | 4,303,566 | 3,873,838 | (1,033,529) | (21.1) | " 8 |
| | OPERATING EXPENSE: | | | | | | |
| 9 | Maintenance of equipment | 1,137,601 | 1,166,786 | 1,184,514 | 46,913 | 4.1 | Line 13 |
| 10 | Transportation | 2,293,198 | 2,251,455 | 2,389,151 | 95,953 | 4.2 | " 28 |
| 11 | Miscellaneous operations | 305,064 | 286,338 | 329,265 | 24,201 | 7.9 | " 31 |
| 12 | Railway tax accruals | 176,171 | 187,538 | 198,538 | 22,367 | 12.7 | " 32 |
| 13 | Total Railway Operating Expenses | 3,912,034 | 3,892,117 | 4,101,468 | 189,434 | 4.8 | " 33 |
| 14 | PROFIT OR (LOSS) FROM OPERATIONS | 995,333 | 411,449 | (227,630) | (1,222,963) | | Line 34 |

In all major particulars these figures were accepted by the Commission as accurate and worthy of belief.

The financial condition of the carrier was found to be as follows:

Financial data.—E-L's general balance sheet as of June 30, 1966, shows assets totaling $655.4 million, including current assets $53.9 million; special funds $3.5 million, investments $24.7 million; transportation property, less accrued depreciation and amortization of defense projects, $561.4 million; miscellaneous physical property, less accrued depreciation, $5.9 million; and other assets $6.1 million. Liabilities consisted of current liabilities $33.2 million; long-term debt due within 1 year $8.8 million; long-term debt $337.9 million; reserves $3.8 million; other liabilities and deferred credits $18.2 million; capital stock $163.0 million; capital surplus $31.3 million; and retained earnings $59.4 million.

E-L's income statements for 1964, 1965, and the first six months of 1966 show, respectively, railway operating revenues of $212.4 million, $230.0 million, and $115.9 million; net railway operating income $15.4 million, $27.0 million, and $16.7 million; and net income (deficit) after fixed charges and interest ($8.3 million), $3.3 million, and $4.6 million.

During the past 10 years the system passenger train operations of E-L (including the combined results of the Erie and the Lackawanna for the periods prior to their merger on October 17, 1960) have been conducted at a substantial deficit. During this ten-year period, E-L and its predecessor railroad companies earned net freight railway operating income of $128,791,345 and incurred a net passenger railway operating deficit of $125,774,755. Freight operations resulted in deficits of $6.5 million in 1961 and $0.7 million

6. The following table, introduced into evidence by the railroad, became Appendix C to the Commission's report and is found at 330 I.C.C. at 527.

in 1963. Passenger operations resulted in deficits each year.

Strict economies have been applied to all controllable costs. Aggressive efforts have been made to increase revenues and to improve service and efficiency. Unnecessary and unprofitable operations are being curtailed or eliminated wherever possible. In 1960, the combined deficit for the two predecessor railroads was $20 million. The merged company had net deficits of $26.5 million in 1961, $16.6 million in 1962, $17.1 million in 1963, and $8.3 million in 1964. E-L had net income of $3.3 million in 1965 and $4.6 million in the first 6 months of 1966. Prior to 1965, the last profitable year was 1957 when $4 million net income was earned. 330 I.C.C. 510–511.

If the facts are as the Commission found them there can be little doubt that the continuation of this service is not demanded by public convenience and necessity and that its continuation at an ever increasing financial loss to the carrier would burden interstate commerce unduly.

Therefore, in the attempt to overturn the Commission's decision, petitioners assign as error numerous of the Commission's supporting findings. In undertaking to examine these alleged errors of fact and law we are mindful that the burden of proving the existence of the errors and of proving the prejudicial effect of the errors upon the conclusions of the Commission is on the petitioners, R–C Motor Lines, Inc. v. United States, 241 F.Supp. 124, 127 (M.D.Fla.1965); Boston and Maine Railroad v. United States, 208 F.Supp. 661, 670–671 (D. Mass.), affirmed, 371 U.S. 26, 83 S.Ct. 117, 9 L.Ed.2d 95 (1962) (per curiam) and that, in order to establish an assigned error, petitioner's evidence tending to establish it must be strong and convincing. See Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). If the Commission's findings are supported by substantial evidence and there is a ra-

tional basis for the Commission's conclusions, then we must, even though we, as reasonable men, might reach a contrary conclusion, refrain from setting aside the Commission's order. See, e. g., Interstate Commerce Commission v. Jersey City, *supra.* We apply these standards which govern our review and we hold that the Commission did not err in making its determination.

Petitioners launch a wide-ranging attack upon the Commission's conclusion that public convenience and necessity do not require the continuation of the passenger service. Petitioners first contend that the Commission-approved method used by the E-L to compute the number of passengers utilizing the four trains resulted in a lower than actual figure and thus misstated the public demand for the rail service. We do not agree. The method used to calculate the average number of passengers per trip was a reasonable method. Persons not counted by this method, such as persons riding free on passes, were not relevant to the determination of the public demand for the service. The Commission stated:

> Moreover, it must be borne in mind that the actual passenger utilization of the equipment is not reflected in the total number of passengers per trip, for most of the passengers travel less than the total distance. For example, on train No. 21 in 1965, although the average number of passengers per trip was 20.56, the average (over the year) for the largest number on the train at any one time was only 12.5. As another example, while train No. 1 served on the average 223 passengers during the nearly 1,000-mile run, the number of passengers on the train at any one time ranged between an average low of 37.6 and an average high of 92.6. It is apparent that these trains run much of the time with a high percentage of unused capacity. 330 I.C.C. at 521.

Therefore the actual public demand was even less than that calculated as representing the average number of passen-

gers per trip. This fact was recognized and weighed by the Commission.

Second, petitioners assert that even if the average number of passengers per trip was properly determined, the Commission still erred because it did not order the continuation of service as it had in other cases where petitioners assert there had been less of a demand for the service involved. See, e. g., Louisville & N. R. Co. Discontinuance of Service, 307 I.C.C. 655, 659, 667 (1959); Texas & N. O. R. Co. Discontinuance of Service, 307 I.C.C. 725, 732 (1960); St. Louis-S. F. Ry. Co. Discontinuance of Service, 312 I.C.C. 713, 715 (1960); Soo Line R. Co. Discontinuance of Service, 312 I.C.C. 729, 734 (1961). We reject this assertion. The determination of whether a train will be continued or discontinued depends on many variables. Comparisons of the average number of passengers utilizing trains in different cases aids little in reaching this determination unless other pertinent circumstances are also compared, such as among others, the population serviced, the mileage involved, the number of trains involved, the nature of service, the alternate service available, and the financial condition of the carrier. Inevitably each case must stand or fall on its own facts as they are brought out at the Commission hearings.

■ Third, petitioners note that:

Approximately 130 person appeared at the hearings to make statements or give evidence in opposition to the discontinuance of the trains. They were Congressmen; State, city and county officials; representatives of civic, religious, and charitable organizations; businessmen; professional men; and other members of the public, most of whom were occasional patrons of the trains. Public officials and civic leaders opposed the discontinuance on the ground that economic and industrial development of the area is dependent upon continued and increased service by all means of transportation, including railroad passenger service.

Business and professional men testified to the need for both passenger and head-end service. Baby poultry is transported out of the area by mail and express. By reason of lack of heat and fresh air, and because of loading and handling, there is a greater loss in shipment by trucks than in rail head-end shipments. Newspapers and TV news film require prompt transportation and delivery. Business trips by trains are convenient and comfortable, and the service is dependable whereas other means of transportation are subject to interruption.

Students and teachers use the trains to and from school and in holiday travel. Members of religious orders travel on the trains in the performance of their duties. Some passengers are afraid to travel by air and prefer rail to bus travel. 330 I.C.C. at 522.

Petitioners contend that the Commission failed to consider that such an outpouring of public interest in preserving the four trains in question represented a very real public demand that the service be continued. This contention is meritless. There is no requirement that the Commission's report discuss and verbally evaluate each individual piece of opposition evidence presented to the Commission. If the Commission has received evidence which has become part of the record before the Commission this court will not presume that the Commission failed to accord the evidence due consideration in reaching its decision. See Columbia Transportation Company v. United States, 167 F.Supp. 5, 15 (E.D. Mich.1958); Howard Hall Co., Inc. v. United States, 38 F.Supp. 556 (N.D.Ala. 1941), aff'd in part and rev'd in part, 315 U.S. 495, 62 S.Ct. 732, 86 L.Ed. 986 (1942), on remand, 65 F.Supp. 166 (N.D. Ala.1945), aff'd, 328 U.S. 818, 66 S.Ct. 1007, 90 L.Ed. 1599 (1946) (per curiam).[7]

7. Quite understandably the discontinuance of a well-known "name" through passenger train stirs nostalgic memories of the elegance crack through trains personified

Finally, petitioners challenge the Commission's finding that adequate alternate passenger service is available to the area that was serviced by E-L's four trains. This contention is based on the fact that individuals in certain communities will be inconvenienced by the discontinuance of E-L's service because there is no direct alternate bus, air, or rail service between some points formerly serviced by the four trains. Inevitably some persons and some communities are inconvenienced by a discontinuance of rail service. But the Commission is not required to find, before it declines to interfere with a Section 13a discontinuation of service, that every community affected will be left with exactly equivalent alternate service. See Village of Candor v. United States, 151 F.Supp. 889, 893 (N.D.N.Y.1957). The existence and quality of alternate service is but one of the many factors the Commission must balance in determining the public convenience and necessity of a carrier's service, and the balancing of all factors pertinent to the determination has been assigned by the Congress to the Commission and not to the courts. *Id.* at 893.

In the other branch of the attack petitioners assault the Commission's conclusion that the continued operation of the four trains would unduly burden interstate commerce. This assault is an all-encompassing one, like the one attacking the Commission's conclusion that the public convenience and necessity does not require the continuation of service. Petitioners' first major claim of error is that the Commission accepted E-L's pro forma statement, with some minor corrections, and relied on that erroneous statement in concluding that discontinuation would result in an improvement in E-L's net income. Petitioners contend before us, as they contended before the Commission,[8] that the figures presented

by E-L in its pro forma statement were deficient in so many important respects that they were almost totally devoid of any probative value. Petitioners contend that the witness sponsoring the statement at the hearings did not know how the retained revenues and retained expenses were estimated and consequently that the estimates are largely meaningless. We do not agree. Although the witness to whom petitioners refer testified that he lacked direct knowledge about how certain retained revenues and expenses were estimated this does not require that the Commission's decision be set aside in this case. This witness was the assistant director of research and had direct supervision over cost analysis and cost research studies. The Commission did not misstate the relevance of his testimony:

He did not develop the material relating to retained traffc or retained revenues. Those estimates and computations were furnished to him by the traffic and passenger departments so that he could develop the related costs and the net results of operations. Revenues for the years 1963, 1964, 1965, and the first quarter of 1966 were likewise furnished to him by the same departments so that he could develop costs and results of operations for those periods. The witness was quite clear and specific that he had no responsibility or function in the development of actual or retained revenues. He further advised protestants more than once during the cross-examination that the officers of the carrier who were responsible for those computations were in the hearing room and could testify concerning them.

In a brief opening statement, counsel for E-L stated the names of his witnesses and the scope of testimony of each. Among them were the chief ac-

---

in the heyday of railroading. It would have been surprising if the hearings had not been well attended by persons living along the Lackawanna-Erie right-of-way.

8. Almost all of petitioners' challenges to the pro forma statement and other cal-

culations relating to cost and revenues were raised before the Commission. In all instances the Commission rejected the challenges.

countant for testimony concerning revenues, the cost witness concerning the expense of the operation of the trains, the general superintendent to describe train operations, and the eastern passenger sales manager to describe the head-end traffic on the trains. During the second day of the hearings, at the request of protestants for information on which witnesses would stand cross-examination as to the results of operations and financial condition of the carrier, counsel again advised that the chief accountant would testify as to revenues and the cost witness would testify as to the operating expenses and the losses resulting from the operation of the trains.

The general superintendent described the handling of head-end traffic and the proposed handling of retained traffic. The eastern passenger sales manager gave further details on the same subjects and concerning estimated retained head-end traffic. The chief accountant testified concerning passenger usage of the trains and trends in patronage. He also testified as to the revenues of the trains and methods used in computing the revenues. Those witnesses completed their testimony and cross-examination prior to the time the cost witness was called to the stand but they were in the hearing room and available for further cross-examination. There was no request for further cross-examination of the witnesses who had previously testified about traffic and revenues, and who were available and, based on their previous testimony, known to be competent witnesses. 330 I.C.C. at 517–518.

The validity of the *pro forma statement* and of the estimates on which it was based were not discredited by the manner of petitioners' attack upon the probative worth of this particular witness's testimony.

Petitioners also contend that the estimated retained revenues were overstated, and that the $1,273,193 estimate of bulk

mail revenues should be reduced to $879,-000. The Commission discussed this contention, and, in our view, properly disposed of it:

In contending for the latter figure, they accept the actual 1965 bulk mail revenue figure of $1,470,643. They then abstract from another proceeding a figure of 2,331 bulk mail cars said to have been transported on the four trains during the first six months of 1965 and double that figure to 4,662 cars to annualize for 1965. That figure of 4,662 cars is divided into the actual 1965 bulk mail revenue to arrive at $315 as the average revenue per car. Protestants use 2,798 retained bulk mail cars, a figure abstracted from the work papers, and multiply by $315 as their average 1965 revenue per car to arrive at their estimate of retained 1965 mail revenue. In arriving at the 1965 average revenue per car, the protestants used actual 1965 bulk mail revenues but, as a divisor, used an annualized 1965 number of cars based upon a number of cars claimed, in an entirely unrelated proceeding, to have been transported on the trains during the first half of 1965. That figure was brought into the record in this proceeding in the testimony of the consultant witness who made the above computations. On the other hand, E-L used the actual record, as shown in the Post Office accounts, of cars and revenues on a weekly basis separately stated by train and route. The carrier also had its own records of the billings it made to the Post Office. E-L's estimate of retained traffic, based upon accurate records and upon past experience and informed judgment, are reasonably accurate forecasts of retained mail revenue in pro forma 1965 operations. 330 I.C.C. at 518.

The petitioners also allege that the retained expenses of operation are understated in the *pro forma statement*. In this particular the difference between E-L's figures and petitioners' figures is primarily based on petitioners' use of

different methods of accounting and of allocation of expenses from those the carrier used. In its decision the Commission sanctioned the methods used by E-L and rejected the methods employed by petitioners and their witnesses. The determination of the methods of accounting and the methods of cost allocation which provide the most realistic picture of a railroad's operations and most realistically depict the effect a continuance or discontinuance will have on those operations is a determination that requires expertise and, therefore, unless the methods employed by E-L here are shown to be unreasonable or arbitrary, the Commission's preference for the carrier's methods must be assumed by us as the choice of the agency having expert knowledge of proper railroad accounting procedures. See Alton R. Co. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586 (1942); Vermont v. Boston and Maine Corp., supra; City of Philadelphia v. United States, 197 F.Supp. 832, 833–834 (E.D. Pa. 1961); New York v. United States, 98 F.Supp. 855, 860 (NDNY), aff'd, 342 U.S. 882, 72 S.Ct. 152, 96 L.Ed. 662 (1951) (per curiam). Petitioners have not carried the heavy burden of showing the Commission's determination to be unreasonable or arbitrary, and we accept the Commission's determination adopting the carrier's statement of retained expenses of operation.

Other contentions of petitioners as to the proper allocation and determination of revenues and expenses have been adequately discussed in the Commission report and do not merit further discussion. We also note that even if the retained revenues should be lower than estimated in the *pro forma statement* and the retained expenses should be higher that circumstance would not be a sufficient ground for setting aside the order as one capriciously or arbitrarily made for "[t]he burden upon interstate commerce need not be determined with mathematical exactness. (Citations omitted)." Village of Candor v. United States, *supra* 151 F.Supp. at 893. See also New York v. United States, 331 U.S.

284, 328, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947). The critical decisional fact, a fact adequately supported by substantial evidence, is that the Commission found on this evidence that E-L's continued operation of the four trains would result in operating deficits and that discontinuation would produce an improvement in E-L's net income. The exact dollar amount of the improvement is not important.

The only remaining issue is whether the Commission reached the right decision after it had evaluated all the evidence. This determination of whether the public interest would be best served by continuing or discontinuing the trains is a question that requires the exercise of informed expert judgment and the weighing and balancing of many complicated and intricate facts. Under the Act this task has been left to the Commission.

"There is no specification of the considerations by which the Commission is to be governed in determining whether the public convenience and necessity require the * * * [continuance of the four trains and whether interstate commerce will be burdened by their continuance.] Under the Act it was the duty of the Commission to find the facts and, in the exercise of a reasonable judgment, to determine that question. Texas & Pac. Ry. Co. v. Gulf, C. & S. F. Ry., 270 U.S. 266, 273 [46 S.Ct. 263, 70 L.Ed. 578.]" Ches. & Ohio Ry. v. United States, 283 U.S. 35, 42, 51 S.Ct. 337, 339, 75 L.Ed. 824 (1931).

Accordingly we find sufficient evidence in the record and ample authority in the statute to support the Commission's findings incorporated in its report. The conclusions the Commission reached are carefully expressed and clearly explained in the report, and in our view are not inadequate, capricious, or arbitrary. We sustain the order of the Interstate Commerce Commission discontinuing its 49 U.S.C. § 13a investigation, and order petitioner's complaint dismissed.

FOLEY and PORT, JJ., concur.