CITY OF SHERIDAN, City of Clearmont, United Transportation Union, Sheridan Chamber of Commerce, Citizen's Voting League for Retention of Passenger Train Service of Alliance, Nebraska, and Railway Labor Executives' Association, Plaintiffs,

Nebraska State Railway Commission, Edison Real Bird, Edmund Little Light, Joseph Ten Bear, Leo Plainfeather, Harvey Driftwood and Eloise Pease, Intervenor-Plaintiffs,

v.

UNITED STATES of America and Chicago, Burlington and Quincy Railroad Company, Defendants, Interstate Commerce Commission, Intervenor-Defendant.

Civ. No. 5316.

United States District Court
D. Wyoming.
Aug. 13, 1969.

Henry A. Burgess, Sheridan, Wyo., Robert R. Wellington, Crawford, Neb., C. C. Sheldon, Asst. Atty. Gen., Lincoln, Neb., William G. Mahoney, and Gordon P. MacDougall, Washington, D. C., for plaintiffs.

Clarence A. H. Meyer, Atty. Gen. for the State of Nebraska, and C. C. Sheldon, Asst. Atty. Gen. for Nebraska State Railway Commission, for intervenor-plaintiff.

Harold G. Stanton, Hardin, Mont., for the Crow Indians, intervenor-plaintiffs.

Richard W. McLaren, Asst. Atty. Gen., John H. D. Wigger, Dept. of Justice, and Robert N. Chaffin, U. S. Atty., for the United States.

R. T. Cubbage, R. M. Gleason, and Eldon Martin, Chicago, Ill., Paul B. Godfrey, Cheyenne, Wyo., W. L. Peck, J. C. Street, Denver, Colo., for Chicago, Burlington and Quincy R. Co.

Robert W. Ginnane and Barry Roberts, Washington, D. C., for the I. C. C.

Before HICKEY, Circuit Judge, and KERR and CHILSON, District Judges.

## MEMORANDUM OPINION

### PER CURIAM.

This is an action commenced by the plaintiffs pursuant to 28 U.S.C. §§ 2321–2325 seeking to enjoin, suspend, set aside and annul the decision and order of the Interstate Commerce Commission dated January 3, 1969, permitting the Chicago, Burlington and Quincy Railroad Company, hereinafter referred to as CB&Q, to discontinue trains Nos. 42 and 43 operating between Omaha, Nebraska, and Billings, Montana. On April 2, 1969, the Commission denied a petition for reconsideration, and on May 1, 1969, the petition for a finding of general transportation importance was denied.[1] The Commission found that the operation of the two trains was not required by public convenience and necessity and that the continued operation thereof would unduly burden interstate commerce.

Subsequent to prior proceedings,[2] this case was commenced with a notice and supporting statement of a CB&Q proposal filed with the Commission on

---

1. The trains involved were described by the Commission as follows:

 Train No. 43 leaves Omaha daily at 10:10 p. m., central time, and arrives in Billings the next day at 7:55 p. m., mountain time. Train No. 42 leaves Billings each day at 10:00 a. m., mountain time, and arrives in Omaha the following day at 7:30 a. m., central time. 334 I.C.C. at 211.

2. The prior proceedings referred to were stated by the Commission as follows:

 The trains involved here were also the subject of a proceeding decided August

24, 1967, in which the carrier proposed to discontinue the train's service between Billings and Alliance, approximately 475 miles, effective May 1, 1967. This division found that operation of the trains was required by the public convenience and necessity and would not unduly burden interstate and foreign commerce. The service was ordered continued for a period of 1 year from the above-decided date. See Chicago, B. & Q. R. Co.—Discontinuance of Trains, 330 I.C.C. 742 (Billings-Alliance case). 334 I.C.C. at 211.

August 6, 1968, pursuant to Section 13 a(1) [3] of the Interstate Commerce Act.

By order of August 23, 1968, the Commission instituted an investigation of the proposed discontinuance and ordered the continued operation of the trains pending hearing and decision on its investigation. A Commission trial examiner held twelve days of extensive public hearings in Omaha, Lincoln, Grand Island, Brokin Bow and Alliance, Nebraska; Edgemont, South Dakota; Newcastle and Sheridan, Wyoming; and Billings, Montana. The hearings consumed almost 1000 pages of testimony and comprised 66 exhibits. After the close of the hearings, briefs were filed by certain protesting parties, and by the railroad. . The Commission considered the record and the briefs, and on January 13, 1969,[4] the Commission, Division 3, issued its report, finding that operation of the trains is not required by the public convenience and necessity and their continued operation would unduly burden interstate commerce. The order entered by the Commission was that the investigation be discontinued.

Later, on the same day, the plaintiffs commenced this action praying for, among other things, a temporary re-

---

3. § 13a(1) reads:

§ 13a. Discontinuance or change of the operation or service of trains or ferries; notice; investigation; hearing; determination.

(1) A carrier or carriers subject to this chapter, if their rights with respect to the discontinuance or change, in whole or in part, of the operation or service of any train or ferry operating from a point in one State to a point in any other State or in the District of Columbia, or from a point in the District of Columbia to a point in any State, are subject to any provision of the constitution or statutes of any State or any regulation or order of (or are the subject of any proceeding pending before) any court or an administrative or regulatory agency of any State, may, but shall not be required to, file with the Commission, and upon such filing shall mail to the Governor of each State in which such train or ferry is operated, and post in every station, depot or other facility served thereby, notice at least thirty days in advance of any such proposed discontinuance or change. The carrier or carriers filing such notice may discontinue or change any such operation or service pursuant to such notice except as otherwise ordered by the Commission pursuant to this paragraph, the laws or constitution of any State, or the decision or order of, or the pendency of any proceeding before, any court or State authority to the contrary notwithstanding. Upon the filing of such notice the Commission shall have authority during said thirty days' notice period, either upon complaint or upon its own initiative without complaint, to enter upon an investigation of the proposed disconintuance or change. Upon the institution of such investigation, the Commission, by order served upon the carrier or carriers affected thereby at least ten days prior to the day on which such discontinuance or change would otherwise become effective, may require such train or ferry to be continued in operation or service, in whole or in part, pending hearing and decision in such investigation, but not for a longer period than four months beyond the date when such discontinuance or change would otherwise have become effective. If, after hearing in such investigation, whether concluded before or after such discontinuance or change has become effective, the Commission finds that the operation or service of such train or ferry is required by public convenience and necessity and will not unduly burden interstate or foreign commerce, the Commission may by order require the continuance or restoration of operation or service of such train or ferry, in whole or in part, for a period not to exceed one year from the date of such order. The provisions of this paragraph shall not supersede the laws of any State or the orders or regulations of any administrative or regulatory body of any State applicable to such discontinuance or change unless notice as in this paragraph provided is filed with the Commission. On the expiration of an order by the Commission after such investigation requiring the continuance or restoration of operation or service, the jurisdiction of any State as to such discontinuance or change shall no longer be superseded unless the procedure provided by this paragraph shall again be invoked by the carrier or carriers.

4. The *statutory four-month period* had expired on January 6, 1969. The Burlington, however, voluntarily agreed to continue running the trains through January 13, 1969, to allow the Commission an additional week in which to issue a report.

straining order against the discontinuance of the trains until hearing was had and a determination made by a three-judge court. The temporary restraining order was issued by this court enjoining the railroad from discontinuing the trains until further order of the court. The CB&Q moved to dismiss the action for lack of jurisdiction and to dissolve the restraining order. The plaintiffs filed a motion for summary judgment. While these motions were pending, the plaintiffs herein filed with the Commission on February 12, 1969, a petition for reconsideration. On February 27, 1969, a hearing was held before this court on the pending motions. The United States and the Commission took the position that the Court does have jurisdiction to review the Commission's order, but that the matter should be held in abeyance until the Commission could rule on the petitions for reconsideration.[5]

On April 4, 1969, the Commission served its order denying the petition for reconsideration. The Commission found that the challenge to its jurisdiction based upon a claim of premature notice by the CB&Q of the proposed discontinuance, was without merit; that all of the matters set forth in the petition for rehearing had been considered by Division 3 of the Commission in the January 13, 1969, report; that the decision was based on adequate findings supported by the record; that there were no errors of procedure, fact, or law in the proceeding before the Commission; and that no showing had been made warranting reconsideration.

With the dismissal of the petition for reconsideration, the Commission's decision of January 13, 1969, became administratively final and ripe for review by the Court. On April 21, 1969, the plaintiffs filed a petition with the Commission for a finding that an issue of general transportation importance is involved in this case. This petition was denied on May 8, 1969. Upon dismissal of these petitions a hearing before a three-judge court was set for June 9, 1969. The Commission was allowed to intervene. Likewise, the Nebraska State Railway Commission and certain officers of the Crow Tribal Council of the Crow Tribe of Indians of the State of Montana were allowed to intervene as plaintiffs. The CB&Q raised a jurisdictional question in its brief and moved for dismissal of the action on the ground that the federal district court lacked jurisdiction to review the Commission's decision in this matter under Section 13a(1). The court holds that it has jurisdiction over the parties and the subject matter, denies the motion to dismiss, and sustains the decision of the Interstate Commerce Commission.

■ The jurisdictional question of the CB&Q is based on the argument that an Interstate Commerce Commission order to terminate an investigation under Section 13a(1) after the Commission has entered into a full investigation and completed the investigation, is not a reviewable order within the meaning of 28 U.S.C. § 1336. This argument has been advanced to other three-judge district courts where review had been sought after the termination of an investigation under Section 13a(1), and it has been rejected in three well reasoned and learned opinions. Vermont v. Boston and Maine Corp., 269 F.Supp. 80 (D.Vt.1967); City of Williamsport v. United States, 273 F.Supp. 899 (M.D. Pa.1967), affirmed, 392 U.S. 642, 88 S.Ct. 2286, 20 L.Ed.2d 1348 (1968) (per curiam); and most recently in State of New York v. United States, Erie, Lackawanna, et al. (N.D.N.Y.1969), 299 F. Supp. 989. We are in agreement with the reasoning of the Vermont, City of Williamsport, and the State of New York cases. We reject the contrary conclusions reached by the three-judge courts in New Hampshire v. Boston and Maine Corp., 251 F.Supp. 421 (D.N.H.

---

5. Section 17(9) of the Interstate Commerce Act, 49 U.S.C. § 17(9), requires that the Commission shall have disposed of petitions for reconsideration prior to judicial review.

1965); Minnesota v. United States, 238 F.Supp. 107 (D.Minn.1966); and in City of Chicago v. United States, 294 F.Supp. 1103 (N.D.Ill.1969).[6]

■ Having decided that we have jurisdiction of this matter, we proceed to discuss the merits. Our function in this type of case is limited to determining whether there is substantial evidence on the record as a whole to support the Commission's findings and whether the proper legal standards were applied by the Commission to the facts as the Commission found them to be. See Illinois Central R. Co. v. Norfolk & Western Ry. Co., 385 U.S. 57, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); cf. Consolo v. Federal Maritime Commission, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

■ The plaintiffs' first argument is that the Commission's jurisdiction was not properly invoked because the railroad posted and served its notice prior to the expiration of the 1967 order.[7] On August 24, 1967, the Commission ordered the CB&Q to continue operating the two trains between Alliance, Nebraska, and Billings, Montana, for the maximum one year period provided by Section 13a(1). On August 6, 1968, the railroad posted and served notice in accordance with the statute proposing to discontinue the trains between Omaha and Billings. The discontinuance was to take effect September 7, 1968. The plaintiffs argue that before the Commission's jurisdiction may be invoked under Section 13a(1), the trains must be subject to the jurisdiction of the various states through which they pass. They contend that the Commission's jurisdiction was not properly invoked on August 6, 1968, since on that date, the trains were not subject to state jurisdiction, but were subject to the Commission's jurisdiction by the terms of the order

entered August 24, 1967. They argue that since the necessary pre-requisite state jurisdiction did not exist on August 6, 1968, for the filing of a new Section 13a(1) notice, the Commission did not possess jurisdiction to enter into its investigation of that notice on August 23, 1968, or to enter its orders of January 3 and April 2, 1969. Prior to the passage of Section 13a(1) a railroad seeking to discontinue a train crossing state lines was required to comply with the law of each individual state through which the trains passed and obtain approval from each state's regulatory agency. Section 13a(1) was enacted because Congress was dissatisfied with the performance of state agencies with regard to railroad discontinuance cases. A primary purpose of Congress in enacting Section 13a(1) was to permit railroads seeking to discontinue interstate trains to avoid state law entirely and proceed directly to the Commission. To insure rapid disposition of these cases, the statute requires the Commission to meet deadlines. Once an investigation is instituted, the Commission must reach a decision within four months. To insure that trains are not ordered to remain running for unreasonably long periods into the future, and to insure frequent review of these cases, the statute only authorizes the Commission to order continuance for a period not to exceed one year. This language clearly contemplates that if the prescribed procedure is again followed, the trains would remain under the jurisdiction of the Commission. The use of the word "unless" implies a continuing jurisdiction in the Commission which is clearly in accord with the Congressional purpose of having a single Federal agency rather than individual states pass upon these cases. "Unless" implies that a return to state jurisdiction may be

6. The witness at the hearing on S.Res. 284 before the Subcomm. on Surface Transportation of the Senate Committee on Commerce, 89th Cong., 2d Sess. ser. 76 (1966) raised and discussed many of the problems caused by the present form of

§ 13a(1). The general opinion of the members of the subcommittee was that Section 13a was not intended to prohibit court review of a commission order terminating a discontinuance investigation.

7. 330 I.C.C. 742 (1967) Supra, Note 2.

prevented. It is a well established canon of statutory construction that a statute is to be read as a whole. When read as a whole, in the light of its legislative history, Section 13a(1) clearly supports the proposition that a carrier may invoke the Commission's jurisdiction over passenger train discontinuances on a continuing basis. The Commission properly had jurisdiction over trains 42 and 43.

 The plaintiffs and intervenors attack as clearly erroneous the Commission's finding that the continued operation of the two trains was not required by public convenience and necessity and the determination that continued operation of the trains would unduly burden interstate commerce. In an action such as this, the function of the Court is a limited one. The Court has no power to determine the effect of the proposed discontinuance of passenger trains Nos. 42 and 43 upon the public convenience and necessity nor whether the continuation of the trains would constitute a burden on interstate commerce. Congress has placed that responsibility upon the Commission. The Court can only inquire as to whether the Commission's findings are supported by substantial evidence. If its findings are so supported, the Commission's action must stand. See United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535–536, 66 S.Ct. 687, 90 L.Ed. 821 (1946). In its findings relative to public convenience and necessity, the Commission enumerated the factors which were considered, as follows:

"Among the factors to be considered are—population of the communities served, the use by the public of the service sought to be discontinued, other transportation available in the area, the general financial condition of the carrier concerned, and the losses sustained in providing the service. No single factor is by itself necessarily decisive or controlling." 334 I.C.C. at 230.

 In its findings, the Commission relied on evidence that there was a small number of revenue passengers riding on the trains and evidence that there was a declining number of passengers utilizing the two trains over the 896 mile run; that in most areas served by the trains there was adequate alternate means of transportation available by private car, bus, and airline service; and that with the exception of each end of the 896 mile run, the majority of the area served by the trains was rather sparsely populated. The Commission's findings that continued operation would unduly burden interstate commerce were based upon its evaluation of the effect a continuation of the passenger service would have on the on-going financial condition of the carrier. In arriving at this evaluation the Commission considered the carrier's past operating loss and its projected future losses occasioned by providing the passenger service.

The 1966, 1967, and first six months of 1968 passenger traffic and revenues on these two trains clearly demonstrates a decline in passenger traffic.

Passenger traffic. During 1966, 1967, and the first six months of 1968, train No. 42 carried 20,172, 18,037, and 8990 passengers, respectively. During the same periods train No. 43 carried 18,225, 17,003, and 8840 passengers, respectively. Daily revenue passengers per trip for train No. 42 during the three periods averaged 55.-26, 49.69, and 49.39. For train No. 43, the averages were 49.93, 46.97, and 48.58. The average revenue passenger per train-mile for train No. 42 were 20.08, 16.43, and 13.73, and for train No. 43 they were 19.03, 16.30 and 16.30.

The total passenger revenue of $302,961 received from the trains in 1966 failed to cover half of the $639,-838 crew costs (excluding payroll taxes and health and welfare payments) incurred in operating the trains for that year. In 1967 and the first 6 months of 1968, the passenger revenues ($246,855 and $125,450) measured about 37 percent of the crew costs for that period. ($664,125 and $339,-

025). For the first six months of 1968 the passenger revenues combined with the mail revenues ($332,442) were not enough to meet the crew costs. See 334 I.C.C. at 215.

The Commission also considered evidence that since April 1, 1968, no express has been handled since the REA Express Company decided it would no longer utilize these trains. 334 I.C.C. at 212.

The trains afford the only railroad passenger service on the Omaha-Billings route. However, this carrier will continue four trains daily on the easternmost 55-mile segment between Omaha and Lincoln. The Union Pacific will continue service between Omaha and Grand Island (151 miles) with six trains daily, and Billings will continue to receive railroad passenger service from Northern Pacific. The other points on the carrier's Omaha-Billings route will be without railroad passenger service if the trains are discontinued. However, these points are all located on paved, all-weather highways, which, because of the great distances and small populations involved, are rarely congested by traffic.

In addition to that provided by the many private automobiles registered in the territory served by the trains, highway transportation is afforded by several bus lines in the area. The bus transportation between individual points on the rail line, particularly the more populous Nebraska points, is in many instances more convenient than the trains, either in frequency of schedules or in time required, and sometimes in both. Central Greyhound offers six busses, five of which are express, daily in each direction between Omaha and Lincoln, the largest and second largest points, respectively, served by the trains, and seven busses daily each way between Omaha and Grand Island, the fourth largest point.

The segment between Lincoln and Grand Island is served by Continental Trailways, which operates one express and three local busses daily from Lincoln to Grand Island and four locals in the opposite direction. All the locals serve the three intermediate train stations—Seward, York and Aurora.

On their routes in this area, both Greyhound and Trailways operate the most modern busses, with air conditioning, reclining seats, carpets, and individual seat lighting. These busses carry parcels, packages, flowers, et cetera, in addition to passengers. The stations between Grand Island and Broken Bow, Nebraska, are served by United Motorways with a bus that leaves Grand Island daily, except Sunday. Alliance is served by a Star Line bus daily from Scottsbluff and another from Chadron, Nebraska. Continental Trailways serves Edgemont, South Dakota, Newcastle, Osage, Upton, Moorcroft, Rozet, Gillette, Sheridan, Kleenburn, Ranchester and Parkman, Wyoming, and Wyola, Lodge Grass, Crow Agency, Hardin and Billings, Montana. Huntley and Billings, Montana, are also served by Central Greyhound. Twelve communities between Broken Bow, Nebraska, and Edgemont, South Dakota, have no bus service. All are small. Together they total about 4700 in population and, as indicated by past patronage, they have little need for the trains. In 1967, the twelve stations together averaged 7.7 passengers per train, or less than 2/3 passenger per station. These communities are connected by all-weather highway and most of them are within reasonable distance of public transportation.

Except for York, Nebraska, the principal cities and towns have air service. Frontier Airlines serves between Omaha, Lincoln, Grand Island and Alliance, Nebraska, and Billings, Montana. Western Air Lines serves Billings, Montana, and Sheridan, Wyoming. United Air Lines serves Omaha. See 334 I.C.C. at 213 and 214.

The carrier submitted a summary of the revenues it received from and the operating expenses of the two trains for each of the two years and the six

month period.[8] These figures were accepted by the Commission as accurate and worthy of belief.

The carrier sustained a loss of $22.4 million from passenger operations in 1967, the largest loss it has ever ex-

8. Table of financial results of operation of two trains taken from 334 I.C.C. at 218 and 219.

| | 1966 | 1967 | First 6 months 1968 |
|---|---|---|---|
| *Revenues* | | | |
| Passenger | $302,961 | $246,855 | $125,450 |
| Mail–Rail Post Office | 178,936 | 177,520 | 89,254 |
| Mail–Storage | 616,557 | 516,273 | 117,738 |
| Express | 285,256 | 239,776 | 38,366 |
| Newspaper | 16,871 | 16,860 | 8,477 |
| Milk | 6,930 | 7,110 | 2,837 |
| Baggage | 1,053 | 918 | 467 |
| Dining car | 944 | 0 | 0 |
| Freight | 1,476 | 4,598 | 582 |
| | 1,410,984 | 1,209,910 | 383,171 |
| *Out-of-pocket expenses* | | | |
| Wages–enginemen | 294,971 | 308,187 | 158,732 |
| Wages–trainmen | 272,367 | 277,797 | 150,453 |
| Wages–baggagemen (paid REA) | 56,585 | 52,368 | 20,126 |
| Wages–lodging and meals | 25,915 | 25,773 | 9,714 |
| Diesel locomotive–repairs | 137,557 | 179,604 | 77,586 |
| Diesel locomotive–fuel | 132,805 | 141,853 | 60,265 |
| Diesel locomotive–water, lubrication, et cetera | 13,507 | 14,148 | 6,037 |
| Diesel locomotive–enginehouse | 33,522 | 38,806 | 16,856 |
| Diesel locomotive–depreciation | 50,228 | 60,656 | 25,441 |
| Passenger cars–repairs | 116,512 | 92,208 | 32,553 |
| Passenger cars–cleaning and air conditioning | 79,778 | 94,417 | 35,216 |
| Passenger cars–depreciation | 16,087 | 13,974 | 3,548 |
| Passenger cars–rental | 10,975 | 32,848 | 4,096 |
| Net pullman loss | 84,052 | 94,873 | 50,956 |
| Station force reduction | 133,742 | 138,910 | 58,652 |
| Dining car–wages, food, et cetera | 429 | 0 | 0 |
| Dining car–repairs, et cetera | 420 | 92 | 0 |
| Joint-facility expense– | | | |
| Billings passenger station | $32,242 | $31,502 | $14,996 |
| Billings passenger switching | 3,332 | 5,612 | 1,383 |
| Trackage: Huntley–Billings | 1,193 | 180 | 103 |
| Pilot service–Sheridan | 1,850 | 2,301 | 1,154 |
| Clearing wrecks | 524 | 650 | 326 |
| Damage to property | 2,944 | 1,234 | 620 |
| Damage to livestock on right-of-way | 588 | 650 | 326 |
| Injuries to persons | 10,765 | 12,225 | 5,069 |
| Health and welfare | 38,845 | 40,997 | 19,968 |
| Payroll taxes | 86,341 | 98,817 | 50,980 |
| Total out-of-pocket expenses | 1,638,076 | 1,760,682 | 805,156 |
| Feeder value | 28,219 | 24,198 | 7,604 |
| Net loss | 198,873 | 526,574 | 414,381 |

The projected results of a year's operation after making the necessary adjustments in the carrier's estimate, would be:

### Revenues

| | |
|---|---|
| Passenger | $250,900 |
| Mail–Railway Post Office | 178,508 |
| Mail–Storage | 253,476 |
| Newspaper | 16,954 |
| Milk | 5,674 |
| Baggage | 934 |
| Feeder revenue | 27,538 |
| Total revenues | 688,446 |

### Out-of-pocket expenses

| | |
|---|---|
| Wages–enginemen | 313,535 |
| Wages–trainmen | 233,600 |
| Wages–baggagemen | 105,850 |
| Wages–lodging and meals | 16,425 |
| Diesel locomotive–repairs | 148,628 |
| Diesel locomotive–fuel | 117,530 |
| Diesel locomotive–water, lubrication, et cetera | 11,680 |
| Diesel locomotive–enginehouse | 32,412 |
| Diesel locomotive–depreciation | 48,910 |

perienced. Its rate of return on property investments was 2.36 percent for that year and in the years 1960 through 1967, its highest rate of return was 3.77 percent. See 334 I.C.C. at 214 and 215.

The Commission also considered evidence that the railroad has made efforts to upgrade the service of these two trains and increase their efficiency and increase the number of persons using the trains. Widespread advertisements were made by radio, television, and newspapers throughout the area served by the trains.

If the facts are as the Commission found them to be, there can be little doubt that the continuation of this service is not demanded by public convenience and necessity and that its continuation at an ever increasing financial loss to the railroad would unduly burden interstate commerce.

We have thoroughly reviewed the record in this case, which necessarily must be the basis of our decision, and find nothing to support the witness' charges of collusion or irregular conduct on the part of the carrier, the hearing examiner, and other parties referred to by the witness, to deprive him, or any other person of a full, fair, and impartial hearing with regard to the proposed train discontinuances. See 334 I.C.C. at 225. We conclude, therefore, that the hearings held by the examiner were fair and impartial.

The plaintiffs' next contention is that certain revenue and expense figures were inadequately presented to the Commission by the railroad. They argue that there is no reliable or probative evidence that certain locomotive and car costs should be discounted by only twenty percent for overhead expenses that would remain upon discontinuance. They also argue that the railroad failed to present evidence as to what portion of the labor costs included in the repair accounts is savable. The plaintiffs also allege that mail revenues and feeder revenue have not been sufficiently considered by the Commission. It is evident from the decision of the Commission, that they considered and evaluated the methods employed in computing financial results and that they approved of these methods. The plaintiffs have not sustained the burden of showing that the Commission's determination is unreasonable or arbitrary, and we accept the Commission's determination adopting the railroad's statement of revenues and expenses.

The only remaining issue is whether the Commission reached the right decision after it had evaluated all the evidence. Whether or not the public interest requires the continuation or discontinuation of the trains here involved is a delicate decision requiring expert judgment, and under the Transportation Act, this determination has been left to the Commission. Their decision must be allowed to stand unless it is unreasonable or arbitrary and not supported by the evidence as presented by the record.

| | |
|---|---:|
| Passenger cars–repairs | 55,188 |
| Passenger cars–cleaning and air conditioning | 61,685 |
| Passenger cars–depreciation | 4,015 |
| Passenger cars–rental | 4,015 |
| Net pullman loss | 94,900 |
| Station force reduction | 109,500 |
| Joint-facility expenses | 28,835 |
| Pilot service–Sheridan | 1,095 |
| Clearing wrecks | 730 |
| Damage to property | 1,095 |
| Damage to livestock on right-of-way | 730 |
| Injuries to persons | 9,855 |
| Health and welfare | 43,800 |
| Payroll taxes | 102,565 |
| Feeder costs | 13,769 |
| Total out-of-pocket expenses | 1,560,347 |
| Net loss | 844,363 |

With these guidelines in mind, we find sufficient evidence in the record and ample authority in the statute to support the Commission's findings in the report. Their findings were not unreasonable or arbitrary. Accordingly, we sustain the order of the Interstate Commerce Commission discontinuing its investigation, and an order will be entered dissolving the temporary restraining order and dismissing plaintiffs' complaint.

## SPECIAL CONCURRENCE AND DISSENT

HICKEY, Circuit Judge.

I concur with the majority's treatment of the question of jurisdiction of the court and with its treatment of the jurisdiction of the Interstate Commerce Commission with regard to the particular effect of Section 13a(1) of the Interstate Commerce Act. I also agree with the majority's statement of the scope of review which we have in this case.

I cannot concur with the majority conclusion that the Commission order was supported by substantial evidence contained in the record, because I have concluded that "public convenience and necessity" should be construed to include factors affecting the public good relating to the general importance of transportation which are above and beyond the mere number of passengers customarily using the passenger service, the effect of a discontinuance upon those depending upon the service, and the jobs lost by displaced employees.

The record indicates that the Commission considered only the last three items, together with the extent to which other transportation is available in making its determination.

I recognize the Commission must balance the "public convenience and necessity" factor against the "undue burden on interstate commerce", and I do not dispute their conclusion on the weight to be drawn from each factor as long as the conclusions are supported by substantial evidence. However, I find the record totally void of evidence that shows the public interest as a part of "public convenience and necessity". My disagreement is based on the fact that the Commission did not consider the general benefits to the populace and the region served, or the convenience to those in the vicinity, which is explicitly included by the statute as being proper for its consideration.

The evidence I find in the record relating to these factors supports only the plaintiffs. The Governor of the State of Wyoming and 230 protesting witnesses all testified that they thought the service necessary or beneficial. I find no evidence other than questionable inferences of any lack of need in the public interest for continued passenger train service. The findings of the Commission are related to and based solely upon economic effects upon the franchised carrier. The Congress of the United States is currently considering the very delicate problem of public interest requiring continuation of passenger rail service, and therefore until it is resolved by Congress, I would continue the injunction, reverse the Commission's order, and remand the matter to its expertise in the consideration of the public interest.